830 A.2d 519

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Michelle Sue THARP, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 22, 2002.

Decided July 2, 2003.

Reargument Denied Sept. 4, 2003.

208

Glenn Alterio, for Michelle Sue Tharp.

John C. Pettit, Washington, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania,

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice CASTILLE.

This is a direct appeal from the sentence of death imposed on appellant by the Court of Common Pleas of Washington County.[1] We affirm.

Appellant's trial was originally listed for June 14, 1999. Approximately one week prior to the commencement of jury selection, however, appellant and her then-co-defendant Douglas Bittinger, Sr., filed requests to waive their rights to a jury trial. In response, the Commonwealth requested a jury trial pursuant to the 1998 amendment to Article I, Section 6 of the Pennsylvania Constitution.[2] The trial court granted the Com-

---

1. 42 Pa.C.S. § 9711(h)(1).

2. The amendment provides: "in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused." Pa. Const. Art. I, Sec. 6.

monwealth's request. Appellant and Bittinger appealed to this Court, which affirmed the trial court's order in a unanimous opinion. *Commonwealth v. Tharp*, 562 Pa. 231, 754 A.2d 1251, 1255 (2000) (holding that amendment to Article I, Section 6 was constitutional and that there was no impediment, constitutional or otherwise, to applying it in this case). Upon remand, appellant's case was severed from that of Bittinger, who testified against appellant at trial.[3]

On November 13, 2000, following a jury trial, appellant was convicted of first-degree murder,[4] endangering the welfare of a child,[5] and abuse of a corpse,[6] arising from the starvation death of her dependent seven-year-old daughter, Tausha Lee Lanham. At the penalty phase, the jury found one aggravating circumstance: the victim was a child under twelve years of age.[7] The jury also found two mitigating circumstances: that appellant had no significant history of prior criminal convictions,[8] and the "catchall mitigator," *i.e.,* any other evidence of mitigation concerning the character and record of appellant and the circumstances of her offense.[9] The jury determined that the aggravating circumstance outweighed the mitigating circumstances and, accordingly, returned a sentence of death.[10]

Thereafter, the trial court formally imposed the sentence of death. In addition, the trial court sentenced appellant to a consecutive term of one to two years' imprisonment on the charge of abuse of a corpse. The trial court imposed no additional sentence for endangering the welfare of a child as that sentence merged for sentencing purposes with first-degree murder. Appellant filed post-sentence motions, which

---

3. The record does not reveal the ultimate disposition of the charges against Bittinger.

4. 18 Pa.C.S. § 2502(a).

5. 18 Pa.C.S. § 4304.

6. 18 Pa.C.S. § 5510.

7. 42 Pa.C.S. § 9711(d)(16).

8. 42 Pa.C.S. § 9711(e)(1).

9. 42 Pa.C.S. § 9711(e)(8).

10. 42 Pa.C.S. § 9711(c)(1)(iv).

were denied by the trial court on June 13, 2001. This direct appeal followed, in which appellant raises six claims for relief.

Appellant first asserts that the evidence was insufficient to support a guilty verdict on the charge of first-degree murder. Specifically, appellant claims that the Commonwealth failed to prove that the starvation death of Tausha Lee Lanham resulted from a specific intent to kill. Even in the absence of a sufficiency challenge, this Court performs a self-imposed duty to review the sufficiency of the evidence underlying the first-degree murder conviction in all capital cases. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In reviewing the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial, and all reasonable inferences drawn from the evidence in favor of the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (2000) (*citing Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991)).

Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that a human being was unlawfully killed; that the accused is responsible for the killing; and that the accused acted with specific intent. 18 Pa.C.S. § 2502(a); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth can prove this specific intent to kill from circumstantial evidence. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998).

Evidence adduced at trial revealed that Tausha Lee Lanham was appellant's second child, born prematurely on August 16, 1990. Tausha was hospitalized for the first year of her life due to her premature birth and resulting health problems. The Pennsylvania Department of Public Health provided services for Tausha following her release from the hospital until

March 1993. At that time, Tausha was "small" but looked "fine." Trial Transcript ("T.T.") Nov. 7, 2000, at 319.

Tausha's aunt, Rhonda Lanham, lived with appellant and her children during the winter months of 1994 and 1995. While there, Rhonda observed that Tausha was routinely given a small amount of food and then sent away from the table, while the other children stayed at the table and had second helpings. On one occasion, Rhonda picked Tausha up from her crib and found that her diaper was completely soaked through. There were, however, no diapers to be found in the house. In addition, during Tausha's "potty training" phase, food was withheld from her and she was strapped on top of the toilet. Rhonda Lanham was so concerned for the well-being of Tausha that she offered to take Tausha to live with her. Appellant refused this offer.

After her relationship with Tausha's father ended, appellant had a relationship with Robert Skiles, which also produced a child, a daughter born on June 6, 1994. Thereafter, appellant met Douglas Bittinger, Sr., and he moved in with appellant and her now-three children in June of 1996. The couple had a child of their own, a son born on October 17, 1997.

Bittinger testified that during his cohabitation with appellant, the family would eat dinner without Tausha, who was kept trapped in a corner by various pieces of furniture, which she could not easily move. Appellant instructed Bittinger not to feed Tausha while she was away from the apartment. Bittinger testified that he learned never to ignore this instruction because if he fed Tausha the other children would tell their mother and an argument would ensue. Occasionally, Tausha went two or three days without anything to eat or drink. *Id.* at 417. The deprivation of essential nourishment led Tausha to take extreme measures in an effort to sustain herself. Thus, Tausha would sneak into the pantry at night and eat cake mix or eat out of the dog's bowl. If she caught Tausha fending for herself, appellant would either tie Tausha to her bed or tie her bedroom door shut so as to trap her inside. Bittinger also observed Tausha eat bread that was thrown outside for the birds, pick through the garbage at his

sister's house for food, and drink out of the commode. *Id.* at 413, 417. Bittinger hypothesized that appellant's abuse of Tausha stemmed from appellant blaming Tausha for having to go to work. *Id.* at 418.[11]

Others also witnessed appellant neglect and mistreat Tausha during this period. Audrey Bittinger, Douglas Bittinger's sister-in-law, lived in the apartment above appellant's apartment. Audrey visited Tausha and appellant's other children regularly. In addition, Audrey testified that she occasionally observed appellant's family through a hole under her sink that provided a view of their apartment. She witnessed Tausha locked in her room with a string securing the bedroom door, trapped in a kitchen corner by various pieces of furniture, or kept in the pantry while the rest of the family ate dinner. Audrey also noted that when Tausha seemed ill, appellant would not take her to the doctor. *Id.* at 384. The combination of these observations led Audrey to file a report with Washington County Children and Youth Services (CYS) concerning the abuse and neglect of Tausha. John Hollenbach, the CYS case worker assigned to the case, testified that he attempted to visit appellant's apartment on at least five occasions. These attempts were unsuccessful because appellant removed Tausha from the premises in anticipation of the scheduled visits.

11. Due to Tausha's health issues and the family's economic status, Tausha received welfare benefits in the amount of $393 per month, from the time of her birth through December 6, 1992. Tausha also received approximately $539.40 per month in Supplemental Security Income ("SSI") from December 7, 1992 until her death. Case Worker Darlene Maleski testified that individuals who are eligible to receive either cash assistance or SSI benefits are also entitled to full medical coverage for themselves and their children—including hospitalization, dental care and prescription drug coverage. Maleski further testified that as part of welfare reform efforts in 1997, she was required to meet with appellant to discuss mandated reform efforts and determine how appellant could comply. During this meeting on February 27, 1998, appellant was presented with three options. Since she had a child just over four months old, she could chose an exemption status until her child reached the age of 1; or, she could be placed into a work-related program that accelerated the job placement process; or, she could find a job herself. Appellant chose the second option and, at the end of March 1998, she was hired as a retail clerk at a department store.

Lisa Camp, appellant's neighborhood friend, testified that she saw Tausha eat "toy food," cat food, and dog food. Camp also witnessed appellant feed Tausha with a spoon that was too large for Tausha's infant-sized mouth. When Tausha inevitably gagged, appellant sent Tausha to her room and stopped feeding her. Camp further testified that when appellant's children were at Camp's home, appellant strictly controlled what Tausha was allowed to eat. Appellant allowed Tausha to eat but a quarter of a sandwich, claiming that half of a sandwich would make her sick. Appellant also would not allow Tausha to have snacks and other "goodies." Camp saw Tausha approximately two months before her death and described her as, "[w]eak, frail, cracked lips, sunken faced, [and] starved for attention." *Id.* at 501. Just three weeks prior to Tausha's death, Camp saw appellant and asked how Tausha was doing. Appellant responded that, "she belonged six feet under and in a body bag." *Id.* at 502. The other three children living with appellant and Bittinger were, by all accounts, healthy and well-fed.

On the morning of April 18, 1998, appellant returned home from work. When she went to check on her daughter, appellant found Tausha dead in her bed. At that time, Bittinger was out of the apartment at a local convenience store. When Bittinger returned, appellant informed him that Tausha was dead. Bittinger confirmed Tausha's death and told appellant to call 911. Appellant refused, saying that she was scared that CYS would take her other children away from her. *Id.* at 455.

Appellant and Bittinger did not immediately dispose of Tausha's body. Instead, they placed the body in a car seat in the back of their car and proceeded on some errands with the other children in the front seat. According to Bittinger's testimony, they initially drove to appellant's grandmother's house where they dropped off clothing for the grandmother to wash. *Id.* at 422. They then drove around looking for Bittinger's sister. When they could not find her, they returned to their apartment because appellant "wanted to clean the house up." *Id.* at 423. Bittinger, appellant and the

children then drove to a local fishing location to "see who was out there fishing." *Id.* They did not stop, but instead drove to Empire, Ohio.

Appellant suggested to Bittinger that they dispose of Tausha's body by putting it in a garbage bag with rocks and then throwing the bag into the river. Appellant and Bittinger bought garbage bags at a store in Empire, and then drove via back roads to Follansbee, West Virginia. There, they placed Tausha's body inside three garbage bags, and dropped her in the brush by the side of the road.

Appellant and Bittinger returned to Ohio and stopped at the Fort Steuben Mall. They shopped for a while and then reported to mall security that Tausha was missing, falsely alleging that she was abducted while the couple was in the bathroom and the child was left unsupervised. After an initial investigation by local police failed to unearth any evidence substantiating appellant's and Bittinger's story, the two were brought into the police station for further questioning. Both appellant and Bittinger ultimately confessed that Tausha was dead and that they had hidden her body. Bittinger led the police to Follansbee to retrieve the body, which was recovered some time after 4:00 a.m. on the morning of April 19, 1998.

An autopsy of Tausha's body conducted by Dr. James Frost, West Virginia's Deputy Chief Medical Examiner, revealed that, although 7½ years old at the time she died, the victim weighed only 11.77 pounds and was just 31 inches tall. T.T. Nov. 7, 2000 at 255. Tausha's body showed numerous signs of severe malnutrition. For example, the body had almost no fat whatsoever in parts of the body where the accumulation of fatty tissue is normally found. In addition, there was extreme wear on the grinding surface of Tausha's teeth, a common occurrence in instances of juvenile starvation. Dr. Frost also opined that Tausha had not eaten for several days. Dr. Frost concluded that the cause of death was malnutrition due to starvation, and the manner of death was homicide.

In forwarding her sufficiency claim, appellant points not to the above evidence, but to her own testimony. She argues

that due to her financial difficulties, she could not afford medical care. In addition, appellant contends that she loved Tausha but Tausha never appeared "normal" and even the doctors could not diagnose what was wrong with her. Appellant also argues that Bittinger's more damming version of the events was effectively impeached by his own obvious self-interest in testifying on behalf of the Commonwealth. Appellant further notes that for each type of witness presented by the Commonwealth to show a deliberate withholding of food or a hardness of heart—friends and family members, expert witnesses, prison cellmates to whom she confided—there was a competing witness or witnesses who testified favorably for her. For example, appellant notes that members of her family testified on her behalf that Tausha appeared normal and was always small, that appellant never withheld food from Tausha or mistreated her in any way, and that appellant treated all of her children the same. Appellant also notes that her medical experts opined that Tausha died from malnutrition as a result of a pre-existing medical condition known as "failure to thrive."[12] After surveying the evidence as a whole, appellant submits that "taking into account all of the evidence and testimony presented, the jury could not reasonably and rationally be convinced beyond a reasonable doubt that [appellant] intentionally killed her child through a willful withholding of food."

The flaw in appellant's sufficiency argument, of course, is that it is based largely on her own testimony and evidence, which the jury was not obliged to accept. *See Commonwealth v. Hornberger*, 441 Pa. 57, 270 A.2d 195, 197 (1970) ("It is well

12. Failure to thrive is a serious medical condition in which a child's height, weight, and motor development fall significantly short of the average growth rates of normal children. About 10% of failure to thrive cases have an organic cause; the rest result from disturbed parent-child relationships manifested in severe physical and emotional neglect of the child. *In the Interest of Patricia S.*, 326 Pa.Super. 434, 474 A.2d 318, 319 (1984) (*citing Interdisciplinary Glossary On Child Abuse And Neglect*, LEGAL, MEDICAL, SOCIAL WORK TERMS, DHEW Pub. No. (OHDS) 78–30137, *reprinted in* CHILD ABUSE AND NEGLECT LITIGATION, DHHS Pub. No. (OHDS) 80–30268 (March 1981)).

settled that a jury or a trial court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness."). Viewing the evidence in the light most favorable to the Commonwealth, the evidence amply supports the jury's conclusion that Tausha was unlawfully killed, that appellant was responsible for the killing, and that she acted with specific intent. Specifically, the evidence established that appellant possessed a willful, deliberate and premeditated intent to starve her daughter to death. Over a long period of time, appellant purposely denied Tausha proper nourishment and directed others to do the same. Appellant even went so far as to physically restrain Tausha so that the young girl would be unable to feed herself. Tausha was reduced to surreptitiously eating dog food, picking through the trash, and drinking out of the commode.

Moreover, appellant continued the deliberate mistreatment of her daughter despite obvious physical indications that Tausha was dangerously malnourished and comments from others that her daughter looked seriously ill. The fact that appellant was conscious of what she was doing was suggested by her own conduct and admissions. She avoided taking Tausha to the doctor and she removed Tausha when the CYS caseworker was scheduled to visit, thus ensuring that those who might have noticed Tausha's condition and taken steps to help her would be unable to do so. In addition, as noted above, appellant told Lisa Camp that Tausha "belonged six feet under and in a body bag," and, after her arrest, appellant stated to one of her prison cellmates: "I'm glad the little retarded baby is dead." *Id.* at 487. Appellant made a similarly disturbing comment to another cellmate, Dena Chandler, when Chandler asked appellant how she could kill her daughter. Appellant responded: "Easily. I never loved her. She interfered with my life." *Id.* at 508. The further fact that appellant dumped Tausha's body and concocted a false tale of kidnapping suggests consciousness of guilt.

We recognize that this case is unusual in that death was not brought about by a single act. Rather, the evidence showed a course of conduct over a 7–year period of time. The perhaps-

unusual facts, however, do not change the ample evidence of appellant's hardness of heart. They do not change the evidence of a seven-year-old's starvation death at the deliberate hand of her own mother. Indeed, the very length of time needed to bring about Tausha's death by starvation suggests a unique type of coldness and deliberation, for within that time there was ample opportunity for reflection, for reconsideration, and for the development of a tinge of sympathy for the child. That appellant still proceeded in her course reveals the sort of premeditation and deliberation that separates first degree murder from other killings or, at least, the jury could so find. Accordingly, appellant's sufficiency challenge fails.

■ In an argument similar to her sufficiency claim, appellant next contends that the jury's first-degree murder verdict was against the weight of the evidence. Specifically, appellant contends she is entitled to a new trial in light of "the numerous amounts of medical testimony submitted [at trial] which substantiated that the [victim] was diagnosed with the preexisting medical condition of 'failure to thrive,' that the [victim] was discharged from the hospital with this condition still existing and that throughout the child's life, her appearance both in height and weight never was 'normal' and that it was this pre-existing medical condition that caused her malnutrition and eventual death and not the willful actions of [appellant]." Brief for Appellant at 15. This claim is meritless.

■ A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the factfinder. *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 703 (2002). Rather, a new trial is warranted only "when the jury's verdict is '*so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.*'" *Id.* (emphasis original) (*quoting Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1189 (1994)). Where, as here, the judge who presided at trial ruled on the weight claim below, an appellate court's role is not to consider

the underlying question of whether the verdict is against the weight of the evidence. *Id.* Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. *Armbruster, supra; Brown,* 648 A.2d at 1190.

Notwithstanding the evidence presented by appellant in support of her "failure to thrive" defense, the Commonwealth presented substantial physical, testimonial, and scientific evidence that Tausha's death was caused by appellant's intentional withholding of food, abuse, and neglect. The jury obviously chose to credit the Commonwealth's evidence and to reject the defense theory of the case. The trial court, which heard the same competing evidence first-hand, concluded that the jury's decision to accept the Commonwealth's theory did not shock its sense of justice. *See* Trial Court slip op. at 18. Since the issue was ultimately one of credibility, the trial court did not abuse its discretion in denying relief.

Appellant next argues that the trial court abused its discretion in denying her request for a change of venue due to pretrial publicity. Appellant does not assert that the pretrial publicity caused her actual prejudice by preventing the impaneling of an impartial jury; rather, she alleges that the pretrial publicity was presumptively prejudicial because it was "extensive" and "sensationalistic." Brief for Appellant at 17. Appellant submits that from April 20, 1998, through January 8, 1999, sixty-four newspaper articles regarding her case appeared in nine newspapers in and around Washington County. Appellant alleges that at least eight of the articles were sensational, inflammatory, and slanted towards conviction. An additional eighteen articles, appellant contends, quoted the Washington County District Attorney concerning his investigation, his decision to seek the death penalty, and his thoughts of entertaining a plea from appellant and/or Bittinger.

The determination of whether to grant a change of venue rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Commonwealth v. Rucci,* 543 Pa. 261, 670 A.2d

1129, 1140 (1996). This is primarily because the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change. *Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1092 (1998). The mere existence of pretrial publicity does not warrant a change of venue. *Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 103 (1996). Ordinarily, a defendant is not entitled to a change of venue unless he or she can demonstrate that the pretrial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. *Karenbauer,* 715 A.2d at 1092. Prejudice will be presumed, however, if the defendant is able to show that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports. *Id; Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902, 906 (1991). Even if the defendant proves the existence of one or more of these circumstances, a change of venue is not warranted unless the defendant also demonstrates that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. *Karenbauer,* 715 A.2d at 1092; *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183, 187 (1985).

Even if it is assumed that the pretrial publicity here was sensational, inflammatory and slanted towards conviction and that it saturated the community, we find no abuse of discretion in the trial court's determination that there was a sufficient lapse of time between the end of the complained-of media coverage and the beginning of jury selection for the adverse effects of the publicity to dissipate or "cool off." The publicity appellant complains of ended on January 8, 1999. Due to the delay resulting from appellant's appeal of the trial court's order granting the Commonwealth's request for a jury trial, jury selection did not commence until November 1, 2000,

almost 22 months later. This lengthy delay was more than sufficient to dissipate any prejudicial effects of the pretrial media coverage. *See Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 294 (1998) (one year period between majority of pretrial publicity and trial was sufficient to dissipate effects of pretrial publicity); *Commonwealth v. McCullum*, 529 Pa. 117, 602 A.2d 313, 317–18 (1992) (nine month period between publication of articles and trial was sufficient to dissipate effects of pretrial publicity); *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035, 1038 (1990) (approximately one year period between time of publication of news stories and selection of jury was adequate cooling-off period to enable impartial jury to be impaneled).

The *voir dire* of prospective jurors confirmed that any presumptive adverse effects of the pretrial publicity had dissipated by the start of trial. Although eighty-five of the one hundred prospective jurors indicated that they had some prior knowledge of the case, only thirty-four stated that they had formed a fixed opinion regarding appellant's guilt or innocence as a result of the pretrial publicity. Thirty of those thirty-four were excused for cause. The remaining four jurors stated that they were more than capable of rendering a fair and impartial verdict and the trial court was satisfied with their assurance. Under these circumstances, the trial judge was warranted in concluding that no change of venue was required. *See Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 872 (2000) (no change of venue required where 75 of 125 jury panel members responded affirmatively when questioned concerning knowledge of case and 15 of 75 had formed opinion); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873, 878 (1975) (no change of venue required where 31 out of 139 prospective jurors questioned had formed fixed opinion); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58, 64 (1971) (no change of venue required where 26 of 138 jurors questioned had formed fixed opinion).

Next, appellant argues that the trial court erred in permitting the Commonwealth to introduce into evidence five color photographs of the victim taken between 1991 and 1995,

as well as a videotape of Tausha depicting her at the birthday party of an uncle approximately one year before her death. In addition, appellant faults the trial court for admitting into evidence three color photographs of the victim taken after her death: (1) a full-body photograph of her naked body as it lay on the coroner's table; (2) a full-body photograph of her clothed while laying on a sheet; and (3) a close-up photograph of her teeth. Appellant contends that the photographs depicting Tausha when alive were too remote in time to be relevant. She claims that the videotape was also irrelevant because, even if it did depict Tausha's appearance to be "somewhat more 'normal'," medical testimony presented by the defense at trial indicated that a child suffering from "failure to thrive" may appear more normal at certain times than others. Brief for Appellant at 22. With respect to the post-mortem photographs, appellant avers that their shocking and inflammatory nature outweighed their evidentiary value. In this regard, appellant alleges that the evidentiary value of the photos was very limited in light of the abundant other evidence, including the statements of appellant and Bittinger and the testimony of various witnesses for the prosecution, supporting the prosecution's theory that appellant willfully withheld food from the victim.

The admission of photographs is a matter resting with the discretion of the trial court. *Commonwealth v. Woods,* 454 Pa. 250, 311 A.2d 582, 583 (1973). Regarding the photographs and videotape of the victim alive, such evidence is admissible if it is relevant to a determination of guilt or innocence. *Commonwealth v. Strong,* 522 Pa. 445, 563 A.2d 479 (1989); *Commonwealth v. Green,* 488 Pa. 611, 413 A.2d 651, 654 n. 2 (1980). Evidence is relevant if it tends to make a material fact more or less likely. *Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110, 117 (2001) ("Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."). The central, disputed issue in this case was whether appellant deliberately starved her child to death, as

the Commonwealth maintained, or whether the child died as a result of a pre-existing condition, "failure to thrive," as appellant maintained. The trial court found that these photographs were relevant to this disputed issue. We agree. The evidence demonstrated that, at earlier points in her life, Tausha, although small for her age, was not dangerously malnourished. The evidence was relevant to rebut the defense that Tausha's death was the consequence of a "failure to thrive" condition which had afflicted her since birth, rather than the deliberate mistreatment and neglect of appellant. The photographs and videotape depicting Tausha to be relatively healthy in the past belied the defense contentions that the victim was "never normal" and suffered from severe developmental problems from birth which ultimately killed her. Furthermore, appellant has not demonstrated how this relatively benign evidence prejudiced her at trial. For this reason as well, this claim fails. *See Strong*, 563 A.2d at 482 ("[E]ven if we agreed with appellant's contention that the admission [of a photograph of the victim] was erroneous, appellant must still demonstrate that the error was prejudicial").

With respect to the post-mortem photographs of the victim, the law regarding the admission of such evidence is well-settled:

> Photographs of a murder victim are not *per se* inadmissible.... The admission of such photographs is a matter within the discretion of the trial judge. The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. First a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1373–74 (1991) (citations omitted), *cert. denied*, 502 U.S. 959, 112 S.Ct.

422, 116 L.Ed.2d 442 (1991). In addition, this Court has observed that:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547, 549 (1982).

Here, the trial court found the photographs to be "inherently inflammatory," but nevertheless determined that their essential evidentiary value was such that their need outweighed the likelihood of unnecessarily inflaming the jury. We find no abuse of discretion in this determination. Although unquestionably unpleasant, the photographs depicting the victim's emaciated body and ground-down teeth were relevant to the jury's determination of the central issue of whether appellant starved Tausha to death and the contested issue of whether appellant acted with a specific intent to kill. The photographs tended to show that Tausha was obviously suffering from an extreme degree of malnutrition prior to her death. They were thus probative of whether appellant knew her daughter was dangerously malnourished, but nonetheless willfully continued to deny her food and failed even to seek or accept medical or social services assistance. Although testimonial evidence was available to the prosecution as to these points, the obviousness of Tausha's condition, which was probative of appellant's intent, was best and most accurately depicted in the postmortem photographs. *See McCutchen*, 454 A.2d at 550 (availability of alternate evidence does not obviate admissibility of photographs; in assessing intent of actor in case of criminal

224

homicide, be it to inflict serious bodily injury or to kill, fact finder who deals in such intangible inquiry must be aided to every extent possible). Since the essential evidentiary value of the post-mortem photographs outweighed their disturbing nature, no error lies on this point.

In her penultimate claim for relief, appellant asserts that the trial court erred in failing to declare a mistrial following an incident in which four members of the jury overheard a defense witness comment on the case during a recess of the trial. On the fourth day of the trial, November 9, 2000, defense witness Charlene Megyesy testified that she had been an inmate at the Washington County Correctional Facility at the same time as appellant and that she and appellant had become friends. Megyesy further testified, among other things, that appellant told her that she loved Tausha, that she cared for the victim just like she cared for her other children, and that she did not kill Tausha. Megyesy also testified that appellant did not confide in any of the other inmates at the prison besides herself, and that she would not have confided in Renee Vogel or Juanita Donnelly, two women who were also imprisoned with appellant at the Washington County Correctional Facility and who had testified earlier in the trial on behalf of the Commonwealth that appellant had made incriminating statements to them. Following Megyesy's testimony, the trial court recessed and four female jurors went to the restroom. While inside the stalls in the restroom, the jurors overheard Megyesy enter the restroom and make statements regarding the case. The jurors' recollections of what Megyesy said varied. Juror number 700 recalled Megyesy saying, " 'She's guilty. They just used me as a scapegoat.' " T.T., Nov. 9–10, 2000, at 626. Juror 763 could not recall Megyesy's comments exactly but did remember her stating that, "she was a scapegoat" or words to that effect. *Id.* at 629. Juror 625 heard Megyesy say, " 'They used me as a scapegoat,' and that's all." *Id.* at 631. Juror number 713 recalled the witness saying, " 'I feel so guilty. They just used me as a scapegoat.' " *Id.* at 633. The jurors immediately left the restroom and notified the trial judge.

Thereafter, the trial judge questioned each of the four jurors individually in his chambers. The trial court asked the jurors whether they understood that Megyesy's comments did not constitute evidence in the case, whether they would be able to set aside what they heard, and whether they could render a fair and impartial verdict based solely on the evidence adduced at trial. Each of the jurors answered these questions in the affirmative. The prosecutor and defense counsel were present when these jurors were questioned and both were afforded the opportunity to examine each juror. At the conclusion of the questioning, appellant moved for a mistrial. The trial court denied the motion.

A defendant has the right to have his or her case heard by a fair, impartial, and unbiased jury and *ex parte* contact between jurors and witnesses is viewed with disfavor. *Commonwealth v. Brown*, 567 Pa. 272, 786 A.2d 961, 972 (2001). There is, however, no *per se* rule in this Commonwealth requiring a mistrial anytime there is improper or inadvertent contact between a juror and a witness. *See Commonwealth v. Mosley*, 535 Pa. 549, 637 A.2d 246, 249 (1993) (declining to adopt *per se* rule which would require disqualification of juror anytime there is *ex parte* contact between that juror and witness). Whether such contact warrants a mistrial is a matter addressed primarily to the discretion of the trial court. *Brown*, 786 A.2d at 972 (citation omitted). A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to have deprived the moving party of a fair and impartial trial. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 282 (2000) (citation omitted).

Here, the witness's somewhat opaque comments were neither elicited by the jurors nor directed at them. The comments also did not relate to factual matters but, apparently, reflected Megyesy's anger following the Commonwealth's cross-examination of her. Furthermore, immediately upon hearing Megyesy's statements, the jurors exited the restroom and informed the trial court, thus evidencing that they took their civic duty and their oaths seriously. No further contact

ensued. Each juror involved specifically told the trial court that she understood that she was not to consider Megyesy's statements as evidence, that she could set aside what she had heard, and that she could render a fair, impartial, and unbiased verdict based solely upon the evidence presented at trial. Upon hearing the jurors' responses to its questions and observing their demeanors, the trial court found their assurances credible. Under these circumstances, we cannot conclude that the trial court abused its discretion in denying appellant's motion for a mistrial.[13] Accordingly, this claim fails.

 Appellant's final argument is that the trial judge erred in failing to recuse himself *sua sponte* and, as a result, she is entitled to a new trial. Specifically, appellant complains that, prior to formally sentencing appellant, the trial judge played an audio recording of the song "The Little Girl," performed by country and western singer John Michael Montgomery.[14] After the song was played, the trial court com-

---

13. In her brief, appellant asserts that in closing argument, the Commonwealth improperly made reference to the jury contact when it commented on Megyesy's change of attitude when she left the witness stand. Appellant argues that this change in attitude was a result of her comment that was overheard by the jurors in the restroom. It is clear from the record that the Commonwealth's reference to Megyesy's change of attitude concerned her demeanor before the incident in the restroom, focusing on her response in court to seeing pictures of the victim. The Commonwealth did not make any reference to the comment in the restroom.

14. The lyrics to "The Little Girl" are as follows:

Her parents never took the young girl to church,
Never spoke of His name,
Never read her His word.
Two non-believers walking lost in this world,
Took their baby with them,
What a sad little girl.
Her daddy drank all day and mommy did drugs,
Never wanted to play,
Or give kisses and hugs.
She'd watch the TV and sit there on the couch,
While her mom fell asleep,
And her daddy went out.
And the drinking and the fighting,
just got worse every night.
Behind their couch she'd be hiding,
Oh what a sad little life.

pared the "sad little life" of the fictitious girl portrayed in the song to the life of Tausha. In addition, the trial court noted that, unlike the girl in the song, Tausha did not get a new chance at life with new parents. Appellant did not move for recusal at sentencing, or at any earlier point during the proceedings before the trial court. Appellant now alleges, however, that, "if the [trial] court was so emotionally effected [sic] and impassioned by the facts of this case as to take the time to locate this song and orchestrate its playing prior to [formal] sentencing, the court should have foreseen that its impartiality could be reasonably questioned and should have recused itself" on its own motion. Brief for Appellant at 26. No relief is due.

As a general rule, a motion for recusal must initially be directed to and decided by the jurist whose impartiality is being challenged. *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 89 (1998). *Accord Commonwealth v. White*, 557 Pa. 408, 734 A.2d 374, 384 (1999). As this Court explained in *Abu–Jamal:*

In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider

And like it always does, the bad just got worse,
With every slap and every curse.
Until her daddy in a drunk rage one night,
Used a gun on her mom and then took his life.
And some people from the city,
took the girl far away.
To a new mom and a new dad,
kisses and hugs everyday.
Her first day of Sunday school,
the teacher walked in,
And a small little girl,
Stared at a picture of him.
She said I know that man, up there on that cross,
I don't know His name,
But I know he got off.
He was there in my old house,
and held me close to his side,
As I hid there behind the couch,
The night that my parents died.

whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make.

553 Pa. at 507, 720 A.2d at 89. *See also Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1088 (1993) ("Once a trial is complete with entry of a verdict or judgment, a party is deemed to have waived his right to have a judge disqualified unless he can meet the standard regarding after-acquired evidence, *i.e.* the evidence could not have been brought to the attention of the trial court in the exercise of due diligence and the existence of the evidence would have compelled a different result in the case"). However, because this is a capital direct appeal, *see Commonwealth v. Freeman*, 827 A.2d 385, 2003 WL 21255941 (Pa. May 30, 2003), and because the trial court addressed appellant's recusal claim in its opinion, we will address the issue.

"It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Abu–Jamal*, 720 A.2d at 89 (citations omitted). Appellant fails to demonstrate that recusal was warranted in this case. Appellant does not identify a single statement, action, or ruling by the trial court during *voir dire*, the guilt phase, or penalty phase of her trial that reveals bias or partiality against her. Instead, her theory is that we should assume that the song evidences a pre-existing bias that must have infected the trial. The trial court's playing of a song at formal sentencing was certainly unorthodox and such conduct is discouraged by this Court. The playing of a popular culture song diminishes the solemnity to be accorded the sentencing procedure particularly where, as here, the ultimate sanction of death has been fixed by the jury and is to be formally imposed. But, this act does not alone demonstrate that the trial court harbored a fixed bias against appellant at the trial. The trial court played the song only after the jury had found appellant guilty of first-degree mur-

der and sentenced her to death, a sentence the trial court was statutorily required to impose. 42 Pa.C.S. § 9711(g). Further, it is evident from the lyrics of "The Little Girl" and the trial court's comments after the song was played, that the playing of the song was intended as an expression of sympathy for the victim, rather than an expression of hostility towards appellant. Although unusual and perhaps ill-advised, the trial judge's actions at sentencing do not warrant a retroactive finding that recusal at trial was required, especially in the absence of any evidence of record suggesting actual bias against appellant that may have affected the fairness of the trial.

Finally, this Court is required to conduct a statutory review of the death sentence. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

*Id.* After careful review of the record below, we conclude that the sentence imposed was not a product of passion, prejudice or any other arbitrary factor. Second, the evidence produced at trial was sufficient to establish the aggravating circumstance found by the jury: that the victim was a child under twelve years of age. The jury also found two mitigating circumstances: that appellant had no significant history of prior criminal convictions and the "catchall mitigator" of any other evidence of mitigation concerning the character and record of appellant and the circumstances of her offense. However, the jury found that the aggravating factor outweighed the two mitigating factors. Thus, it was statutorily required to impose a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of

230

Washington County.[15]

---

15. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S.A. § 9711(i).