J-A26043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KAYLE RAY MEALY | : | |
| | : | |
| Appellant | : | No. 1098 WDA 2024 |

Appeal from the Judgment of Sentence Entered June 7, 2024
In the Court of Common Pleas of Erie County
Criminal Division at No: CP-25-CR-0001287-2022

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY STABILE, J.:                **FILED:  February 3, 2026**

Appellant, Kayle Ray Mealy, appeals from the judgment of sentence entered on June 7, 2024, by the Court of Common Pleas of Erie County.  She was found guilty by a jury of first-degree homicide, endangering the welfare of children ("EWOC"), aggravated assault, and recklessly endangering another person ("REAP").  She challenges the sufficiency of the evidence to sustain her convictions for first-degree murder and EWOC, and the trial court's admission into evidence of post-mortem external autopsy photographs.  We reverse the first-degree murder conviction, affirm the EWOC conviction, find no abuse of discretion in the court's evidentiary ruling, vacate the judgment of sentence, and remand for resentencing.

Appellant was the mother of B.M. ("Child"), born October 2018, and resided in Corry, Pennsylvania.  Child's father, William Hoffman, and stepmother, Kaitlyn Szymanski, exercised custody of Child every other

weekend in Cambridge Springs, Pennsylvania. N.T. Jury Day 1, 2/13/24, at 33. They had custody of Child during the weekend of January 8-10, 2021, and did not have any concerns with Child's health or that he was not eating. *Id.* at 40, 43-44, 62. During that weekend, the child celebrated Christmas and spent time with extended family who also did not have any concerns about Child's health. *Id.* at 67-68. Child was acting normally and was not lethargic. *Id.* at 69.

On January 20, 2021, at 2:11 p.m., Appellant called 911 and reported that Child had died in his crib. *Id.* at 83-84; *see also* Commonwealth's Exhibit 6 (911 Call Transcript). Appellant met first responders at the door and led them up the stairs to the second floor where Child was lying naked and motionless. *Id.* at 85-86. A firefighter checked Child's vital signs and confirmed that he was deceased. *Id.* at 88.

As Appellant was the only other person in the home at the time of Child's death, she agreed to a recorded interview at the Corry Police Department. N.T. Jury Day 1, 2/13/24, at 129. Appellant, who was 21 years old at the time, said she was scared, upset, and wished it was her that died and not her son. *Id.* at 139. Admittedly, she initially did not want to be a mother because she felt that she was not good enough for anyone and should have allowed Child's father to have primary custody. *Id.* at 140-41. Although Appellant found parenting difficult, she said Child was a blessing and denied wanting him to be harmed. *Id.* at 142.

Dr. Eric Vey, a forensic pathologist, conducted an autopsy on January 21, 2021. N.T. Jury Day 2, 2/14/24, at 56. The autopsy revealed that Child's cause of death was severe nutritional wasting due to nutritional neglect. *Id.* at 79. Medical records showed that Child suffered a dramatic weight loss between December 17, 2020, and January 20, 2021, the time of his death – from 29 pounds to 21.56 pounds. *Id.* at 65-66; *see also* Commonwealth's Exhibit 99. Dr. Vey testified that he observed Child to have dried lips, retracted eye globes, a conclave abdomen, and a bony pelvis. *Id.* at 60. He further testified that a child experiencing starvation would be lethargic. *Id.* at 69.

Detective Ann Styn conducted a forensic analysis of Appellant's electronics – two Xbox gaming systems, a laptop, and an iPhone. N.T. Jury Day 2, 2/14/24, at 7-8. There was nothing of evidentiary value found on the Xbox systems and the laptop. *Id.* at 8. However, Detective Styn recovered multiple chats from Facebook Messenger and Snapchat on Appellant's iPhone. *Id.* at 9-10. One such chat commenced at 4:19 a.m. on January 3, 2021, wherein Appellant's mother expressed concerns over Appellant's treatment of Child:

> Jamie Bailey-Mealy: You left your kid in his crib all day and I don't know how often you do that.
>
> [Appellant]: I didn't do that!
>
> Jamie Bailey-Mealy: Well it sure looked that way to me Kayle. He was in there at noon, still in there at 5 you were sleeping so that means you had him in there all day.

[Appellant]: I know it did but it wasn't that way I promise.

*Id.* at 18; Commonwealth's Exhibit 69. Appellant's mother also accused Appellant of leaving soiled diapers strewn throughout Child's room, and asked Appellant "[w]hat is it going to take for you to straighten up and start taking better care of yourself and [Child?]" *Id.* Appellant responded that she was grieving because "I literally have no space, no time to myself or anything." *Id.* at 19; Commonwealth's Exhibit 70. Appellant's mother chastised Appellant for spending "way too much money and time on [video] games" and told Appellant that "[i]f you want to be sad and depressed then you ask someone to take [Child] for the day, not leave him in his crib and do nothing for weeks at a time." *Id.* Appellant responded that video games are the only thing that help her mental health. *Id.*; Commonwealth's Exhibit 71.

In response, Appellant's mother encouraged Appellant to set goals for herself each day and to not prioritize gaming. *Id.* For example, Appellant's mother suggested daily goals, such as "today I'm taking a shower, washing my hair. Gonna make breakfast for me and [Child]. Play, do whatever, and at nighttime, cook dinner, clean up, put [Child to bed], clean up the house then relax." *Id.* (cleaned up).

In addition to these conversations, Detective Styn recovered "a wealth of activity between a user stored in the phone listed as Cutie." *Id.* at 22. "There were several phone calls and FaceTime video calls with that individual, and then there were several Snapchat messages with a user by the name of

Kyle underscore Pinkston." *Id.* Detective Styn identified "Cutie" as Kyle Pinkston. *Id.* at 24. Her examination of Appellant's phone showed an increased volume of Snapchat messages between Appellant and "Cutie" during the early morning hours of January 20, 2021:

> [O]n January 20th between the hours of 2:00 a.m. and 5:00 a.m., 75 messages were sent or received; 59 messages were sent or received at 3:00 a.m. to 4:00 [a].m.; and then 63 messages were sent or received from 4:00 a.m. to 5:00 a.m.

*Id.* at 27; Commonwealth's Exhibit 81. Many of these messages were provocative and sexual in nature. *Id.* at 30-35; Commonwealth's Exhibits 84-90. Appellant was also making phone calls during the time that she was exchanging these messages. *Id.* at 36. Although Appellant spent a significant time speaking with "Cutie," she never expressed any frustration with Child or the difficulties of being a mother. *Id.* at 47.

On March 11, 2022, Appellant was charged with criminal homicide, EWOC, aggravated assault, and REAP. On February 9, 2024, Appellant filed a pretrial motion *in liminie* to preclude the Commonwealth from admitting "pictures taken of the deceased victim or pictures from his autopsy." *See* Motion, 2/9/24. By order entered February 12, 2024, the trial court found that the probative value of the photographs outweighed any unfair prejudice to Appellant, and it denied Appellant's motion.

A jury trial was held on February 13 and 14, 2024. Appellant was found guilty of first-degree homicide, EWOC, aggravated assault, and REAP. On June 7, 2024, Appellant was sentenced to life imprisonment for first-degree

- 5 -

homicide and a consecutive 10 to 20 years imprisonment for EWOC. Appellant's aggravated assault and REAP convictions merged for sentencing purposes. Appellant filed a post-sentence motion, which was denied by the trial court. This appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Is the evidence sufficient to sustain Appellant's conviction for first degree homicide, specifically, that Appellant formed the willful, deliberate and premeditated intent to kill her son?

2. Is the evidence sufficient to sustain Appellant's conviction for endangering the welfare of a child, specifically, that [Appellant] acted knowingly?

3. Did the trial court abuse its discretion when it permitted the Commonwealth to introduce photographs and/or multiple photographs of the deceased child from the scene and from the autopsy as the photographs served to inflame the passions of the jury and the probative value was outweighed by the potential for prejudice?

Appellant's Brief, at 8.

Appellant's first two issues contest the sufficiency of the evidence to sustain her convictions. For a challenge to the sufficiency of the evidence, our standard of review is:

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and

- 6 -

inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

*Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019) (citation omitted).

Appellant argues that the Commonwealth failed to present evidence establishing that she had a specific intent to kill Child. *See* Appellant's Brief, at 39. "Instead, the messages introduced by the Commonwealth from Appellant's mother, coupled with the testimony of her isolation inside an unkempt home, revealed that Appellant was either suffering from mental health issues, intellectual deficits and/or a complete lack of insight as to how to properly care for herself and the child." *Id.* We are constrained to agree.

"Evidence is sufficient to sustain a conviction for a first-degree murder when the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the accused is responsible for the killing; and (3) the accused acted with specific intent [to kill]." *Commonwealth v. Chambers*, 980 A.2d 35, 44 (Pa. 2009). Specific intent to kill is "the state of mind . . . which accompanies a killing which was willful, deliberate and premeditated." *Commonwealth v. Sherwood*, 982 A.2d 483, 493 (Pa. 2009) (citation omitted). A killing is willful, deliberate and premediated when it is committed by one whose conscious purpose is to end the life of the victim.

***Commonwealth v. Fitzpatrick***, 159 A.3d 562, 567 (Pa. Super. 2017). "Where one does not verbalize the reasons for his [or her] actions, we are forced to look at the act itself to glean the intentions of the actor. Where the intention of the actor is obvious from the act itself, the finding of fact is justified in assigning the intention that is suggested by the conduct." ***Sherwood***, 982 A.2d at 493 (citation omitted).

The trial court found there was sufficient evidence to sustain Appellant's first-degree murder conviction:

> At trial, evidence showed that the officers of the Corry, Pennsylvania Police Department were dispatched to [Appellant's] home, where they found her two year old son, naked, dead on the floor upstairs. He appeared to be dead for some time. [Appellant] gave inconsistent statements as to when she had checked on him. Analysis of her phone revealed she had been constantly talking to an out-of-town male on the phone during the time period the child was dying.
>
> Dr. Vey, a forensic pathologist, performed the autopsy on the boy, and concluded he died as a result of "severe nutritional wasting due to nutritional neglect." He testified that there was no evidence of any pre-existing medical conditions. Relatives of [Appellant] testified that the boy had a healthy appetite and would not have any difficulty eating. [Appellant's] house contained food and water, and there the boy could have been fed.

Opinion and Order, 8/9/24, at 1.

This conclusion was based on the following evidence: (1) Appellant provided inconsistent statements as to the last time she checked on Child; (2) Appellant was constantly on the phone during the time when Child was dying; (3) Child's cause of death was severe nutritional wasting due to nutritional neglect; (4) Child had a healthy appetite and did not have any difficulty eating;

and (5) Child could have been fed because there was food and water in Appellant's home. **See id.**

While tragic, this evidence, when viewed in the light most favorable to the Commonwealth as the verdict winner, is not sufficient to establish Appellant's specific intent to kill her child. Neither the trial court nor the Commonwealth cite any evidence to establish Appellant had the *specific intent* to kill her son. The court and Commonwealth merely rely on the fact that Child died of starvation and dehydration while in Appellant's care. That is not enough to prove the death of Child was the result of a willful, deliberate and premediated killing.

Medical records showed that Child suffered a dramatic weight loss between December 17, 2020, and January 20, 2021, the time of his death – from 29 pounds to 21.56 pounds. Dr. Vey testified that he observed Child to have dried lips, retracted eye globes, a conclave abdomen, and a bony pelvis. He further testified that a child experiencing starvation would be lethargic. Although signs of starvation and/or malnutrition may be visible to an expert, the record is devoid of evidence that Child showed signs of deterioration leading to his unfortunate death, or that Appellant was aware of those signs. Child's father and stepmother last exercised custody of Child on January 8-11, 2021, and did not have any concerns with his health or that he was not eating. Child was acting normally and was not lethargic.

Moreover, the evidence does not support a finding that Appellant intended to kill her child. On the 911 call, Appellant was hysterical, emotional,

and screaming to the point that the dispatcher had trouble understanding her. N.T. Jury Day 1, 2/13/24, at 115. Appellant was visibly upset when first responders arrived and continuously apologized that her apartment was messy. *Id.* at 91. In her recorded statement to police, Appellant said she was scared, upset, and wished it was her that died and not her son. Appellant admitted that she initially did not want to be a mother because she felt that she was not good enough for anyone and should have allowed Child's father to have primary custody. Although Appellant found parenting difficult, she said Child was a blessing and denied wanting him to be harmed.

While Appellant's shameful neglect may be characterized in many ways, without reweighing the evidence, we cannot conclude the evidence suffices to sustain a specific intent to kill, or in other words, Appellant desired the death of her child. The evidence relied upon by the trial court may support a grossly negligent appreciation of Child's condition and misplaced priorities to the detriment of Child's welfare, but we cannot find in this evidence a specific intent to kill to support a first-degree murder conviction. Appellant certainly may be guilty of a lesser degree of murder, but not first-degree.

The trial court cited **Commonwealth v. Tharp**, 830 A.2d 519 (Pa. 2003) to support its conclusion that the evidence established Appellant's specific intent to kill. This case is clearly distinguishable. Multiple witnesses observed Tharp intentionally limit the amount of food given to the decedent child and punished the child when caught fending for herself. *Id.* at 524-25. An upstairs neighbor testified that she observed the child "locked in her room

with a string securing the bedroom door, trapped in a kitchen corner by various pieces of furniture, or kept in the pantry while the rest of the family ate dinner." *Id.* at 524. Tharp instructed her paramour not to feed the child while she was away, and if he did, the other children in the home would tell Tharp, who would lash out at him. *Id.* The child would often sneak out of her room at night and eat cake mix and food out of the dog's bowl. *Id.* Tharp would tie the child to her bed or trap her in the bedroom if caught. *Id.*

Two months before the child's death, a neighbor described the child as "weak, frail, cracked lips, sunken face, and starved for attention." *Id.* at 525 (brackets omitted). Three weeks prior to the child's death, the same neighbor asked Tharp how the child was doing. *Id.* Tharp responded that "she belonged six feet under and in a body bag." *Id.* By all accounts, the other children living in the home were healthy and well-fed. *Id.* When Tharp discovered her child was deceased, she did not call 911 and instead disposed of the child's body on the side of the road in West Virginia. *Id.* at 526.

The evidence presented in *Tharp* established that the appellant possessed a willful, deliberate and premediated intent to starve her daughter to death. The evidence in this case pales in comparison. Unlike *Tharp*, there was no evidence that Appellant deliberately withheld food, instructed others to withhold food, punished Child if he tried to eat food, or locked Child in his room to prevent him from eating or as punishment for eating. Nor did Appellant make a statement that she wished her child was deceased.

Though there was evidence that Appellant spent a significant time on the phone with at least one person and ignored her parental duties leading up to Child's death, this evidence is not sufficient to establish Appellant's specific intent to kill.

Accordingly, viewing the evidence in a light most favorable to the Commonwealth as the verdict winner, the evidence was insufficient to sustain Appellant's first-degree murder conviction because the Commonwealth failed to prove that Appellant had the specific intent to kill.

In Appellant's second issue, she challenges the sufficiency of the evidence to sustain her EWOC conviction, graded as a felony of the first degree.[1] "A parent, guardian or other person supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1). "Knowingly" is defined as follows:

> A person acts knowingly with respect to a material element of an offense when:
>
> (i)   if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

---

[1] Generally, EWOC is graded as a misdemeanor of the first degree. 18 Pa.C.S.A. § 4304(b)(1)(i). To increase the grading to a felony of the first degree, the Commonwealth must prove, beyond a reasonable doubt, that (1) the accused's conduct created a substantial risk of death or serious bodily injury; (2) the accused engaged in a course of conduct; and (3) that the child was under six years old. *See* 18 Pa.C.S.A. § 4304(b)(1)(iv), (b)(2).

> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b)(2). This Court has employed a three-prong test to determine whether the Commonwealth's evidence is sufficient to prove that a defendant knowingly violated a duty of care under Section 4304(a)(1):

> (1) the accused must be aware of his or her duty to protect the child; 2) the accused must be aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused either must have failed to act, or must have taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Sebolka*, 205 A.3d 329, 337 (Pa. Super. 2019). "Moreover, in determining what conduct violates the EWOC statute, the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Commonwealth v. Delamarter*, 302 A.3d 1195, 1206 (Pa. Super. 2023) (citations and quotation marks omitted).

Here, Appellant's argument is limited to the *mens rea* element – she contends that the Commonwealth failed to prove that she "had an awareness of the accelerated rate at which a small child's health would be imperiled by inadequately eating or drinking." Appellant's Brief, at 46. The trial court's reasoning for finding sufficient evidence to sustain Appellant's EWOC conviction is the same as its rationale for first-degree murder. *See*, *infra.* However, the *mens rea* for each offense is different – a specific intent to kill

versus knowingly violating a duty of care. Thus, the court failed to make a specific finding as to the *mens rea* for EWOC. Nevertheless, our review is not hampered as the sufficiency of the evidence is a question of law which this Court may address if properly preserved. *See, e.g., Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

Applying the three-prong test to the facts of this case, we conclude that there is sufficient evidence to sustain Appellant's EWOC conviction. First, "[a] parent has a legal duty to protect her child, and the discharge of this duty requires affirmative action." *Commonwealth v. Howard*, 402 A.2d 674, 676 (Pa. Super. 1979). Second, common sense dictates that not feeding or proving water to a child places the child in circumstances that could threaten the child's physical welfare. *See Delamarter*, *supra.* Lastly, the evidence shows that Child died of dehydration and starvation while Appellant prioritized talking on the phone and playing video games which implies that Appellant failed to ensure Child received proper nourishment. Therefore, we conclude there was sufficient evidence to support Appellant's EWOC conviction. She is not entitled to relief on this claim.

In Appellant's final issue, she argues that the trial court abused its discretion when it denied her motion *in limine* to exclude six post-mortem photographs of Child – three depicting Child in the position where emergency responders found him (Exhibits 12-14) and three from Child's external

- 14 -

autopsy the following day (Exhibits 95-97). [2]  ***See*** Appellant's Brief, at 47.

She claims that photographs from Child's external autopsy served no valid

evidentiary purpose:

> These three photographs were taken over one day after [Child's] death and would have captured other natural post-mortem processes that would have further changed the child's appearance in that time.  Further, the contemporaneous condition of the child's body, the fluids on his mouth, and his darkened eyes were all evident in the photographs admitted as Exhibits 12, 13, and 14 and were presented to the jury for its consideration.
>
> The admission of Exhibits 95, 96, and 97, which were much closer photographs of a small child's face and eyes and body on an autopsy table, had no probative value beyond that of the photographs of the child at the scene and had much greater potential for prejudice.  It is the face and eyes of a child with which others form emotional connections.  The cumulative nature of these photographs rendered them inadmissible, as they would have only served to inflame the emotions of a jury in an already difficult case.

***Id.*** at 50-51.

We review a trial court's admission of inflammatory photographs for

abuse of discretion.  ***See Commonwealth v. Kline***, 344 A.3d 831, 835 (Pa.

Super. 2025).  "An abuse of discretion is not merely an error of judgment, but

if in reaching a conclusion the law is overridden or misapplied or the judgment

exercised is manifestly unreasonable, or the result of partiality, prejudice,

bias, or ill will, as shown by the evidence or the record, discretion is abused."

---

[2] Appellant concedes that the trial court did not abuse its discretion when it permitted the Commonwealth to introduce the three photographs depicting Child in the position he was in when first responders arrived.  ***See*** Appellant's Brief, at 50.

*Id.* (citation omitted). In determining whether to admit a photograph of a homicide victim, the court must engage in a two-part inquiry:

> First, the trial court must examine whether the particular photograph is inflammatory. If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Id.* (citation omitted). "A trial court may abuse its discretion where it improperly weighed the probative value of evidence admitted against its potential for prejudicing the defendant." *Id.* (citation and quotation marks omitted).

The trial court concluded, and we agree, that the photographs of Child are inflammatory. They all depict a naked and deceased two-and-a-half-year-old child. Accordingly, the trial court was bound to determine whether the probative value of the photographs outweighed the likelihood of prejudicing the jury. We are guided by the following precepts:

> Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the actions. Pa.R.E. 401. Evidence is excluded if its probative value is outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. This Court has explained that all relevant Commonwealth evidence is meant to prejudice a defendant, thus exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case.

- 16 -

Where photographic evidence of a murder depicts gruesome imagery, a trial court must not merely exclude it based on those qualities. Our High Court has explained:

> While recognizing that photographs of a homicide victim can be unpleasant, disturbing, and brutal, . . . there is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Commonwealth v. Watkins*, 108 A.3d 692, 724 ([Pa.] 2014) (cleaned up). If a trial court were to exclude photos based only upon their disturbing nature, it would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor.

Further, even where non-photographic evidence can describe the nature and extent of a victim's injuries, our High Court has held that the availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence. This is because the condition of the victim's body provides evidence of the assailant's intent, . . . even where the body's condition can be described through testimony from a medical examiner.

*Id.* (quotation marks and some citations omitted).

Instantly, the trial court evaluated the autopsy photographs and determined that the probative value of the evidence outweighed any unfair prejudice to Appellant:

> The Commonwealth alleges [Appellant] intentionally neglected and failed to care for and feed her child, thus causing his death. Accordingly, photographs of the child at the time of his death are highly relevant to the issue of whether [Appellant] was aware, or should have been aware, of issues involving the child's health (specifically weight). The Commonwealth indicated it would introduce approximately 6 photographs, and none involving the child's internal autopsy. The Commonwealth also indicated it

- 17 -

would be introducing photographs of the child when he was healthy, for comparison purposes.

Under these circumstances, the [c]ourt concludes that the probative value of the photographs, albeit unpleasant, outweighs any unfair prejudice, and therefore [Appellant's] motion *in liminie* regarding the photographs is denied.

Order, 2/12/24, at 1.

Despite our conclusion that the evidence was insufficient to establish Appellant's specific intent to kill, we cannot say that the court abused its discretion with this evidentiary ruling. The photographs demonstrated that Child obviously suffered from malnutrition and starvation prior to his death. As the Commonwealth displayed each of the autopsy photographs, Dr. Vey provided commentary to explain how Child's physical condition indicated malnutrition. *See* N.T., Jury Day 2, at 71-75. Therefore, the contested photographs were probative of whether Appellant could have known Child was dangerously malnourished. Although Dr. Vey provided testimony on this point, Child's condition was best represented in the post-mortem photographs. *See Kline, supra.* Thus, no relief is due.

Accordingly, we vacate Appellant's judgment of sentence, reverse her first-degree murder conviction, affirm her EWOC conviction and the trial court's evidentiary ruling on the post-mortem photographs, and remand for resentencing.

Judgment of sentence vacated; first-degree murder convicted reversed; EWOC conviction affirmed; remanded for resentencing.

Judge Olson joins the memorandum.

Judge King files a dissenting memorandum.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  2/3/2026