J-A05031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAURA RAMRIEZ | : | |
| | : | |
| Appellant | : | No. 97 WDA 2024 |

Appeal from the Judgment of Sentence Entered September 20, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0006707-2020

BEFORE: MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:       **FILED: May 23, 2025**

Laura Ramriez ("Appellant") appeals from the judgment of sentence entered following a non-jury trial at which the court found her guilty of first-degree murder, conspiracy to commit, *inter alia*, first-degree murder, endangering the welfare of a child, unlawful restraint, and two counts of aggravated assault.[1] For these offenses, the court sentenced her to a mandatory life sentence for first-degree murder and, at the remaining offenses, imposed an aggregate consecutive term of thirty-seven to seventy-four years of incarceration. On direct review, Appellant contends that: (1) the evidence admitted at trial was insufficient to demonstrate her intent to kill;

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a); 18 Pa.C.S. §§ 903/2502(a); 18 Pa.C.S. § 4304(a)(1); 18 Pa.C.S. § 2902(a)(1); and 18 Pa.C.S. § 2702(a)(1), (9).

(2) the weight of the evidence adduced at trial was so tenuous that the resulting verdict shocked the conscience; and (3) the discretionary aspects of her sentence were discordant with Pennsylvania's Sentencing Code, leading to the imposition of an unreasonable sentence.

Nevertheless, after consideration of all of her contentions, it is: ADJUDGED AND ORDERED that the judgment of the trial court be and is hereby affirmed on the basis of Judge Bruce R. Beemer's lengthy opinion, which thoroughly addresses and resolves each of Appellant's issues on appeal in accordance with established caselaw. The trial court opinion is attached for any further appellate review.

Notwithstanding our adoption of the trial court's opinion, we note that Appellant's purported weight of the evidence challenge is predicated on a post-sentence motion (and appellate brief) that operates exclusively through the lens of sufficiency. **See** Post-Sentence Motion, 9/24/23, at 4-5 ("However, if ever a case is positioned to overcome the jurisprudence that is replete with failed weight of the evidence challenges, the facts presented *sub judice* should be deemed a more than worthy candidate based on the following: a. The evidence presented was unclear as to the actual perpetrator of the crimes charged; and b. The Commonwealth's failure to disprove specific intent to kill requires a [n]ot-[g]uilty [v]erdict[.]"); **but see Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000) ("A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is

sufficient evidence to sustain the verdict.").[2]

Where an appellant fails "to distinguish between [her] sufficiency and weight of the evidence claims and present[s] no argument regarding the weight of the evidence, we deem [her] weight of the evidence issue waived." ***Commonwealth v. Birdseye***, 637 A.2d 1036, 1039-40 (Pa. Super. 1994). Indeed, the court never ruled on Appellant's weight of the evidence challenge, nor included any discussion of it in its subsequent opinion, because of the ambiguity contained in Appellant's post-sentence motion (as well as her subsequent concise statement of errors complained of on appeal). Accordingly, she has waived review of this claim on appeal and is due no relief.

Moreover, although Appellant satisfied the prerequisites for review of her discretionary aspects of sentence claim, ***see Commonwealth v. Miller***, 275 A.3d 530, 534 (Pa. Super. 2022), ***appeal denied***, 302 A.3d 626 (Pa. 2023) (outlining the four-part jurisdictional test necessary for substantive review of a discretionary sentencing claim)[3], she has provided little beyond

_____

[2] Appellant's post-sentence motion does recite *some* generally relevant law regarding a weight of the evidence claim, such as the oft-repeated phrase that the verdict must be so contrary to the evidence as to shock one's sense of justice. ***See*** Post-Sentence Motion, 9/24/23, at 4-5. Nevertheless, her actual argument fatally misses the point and, because her first claim exclusively deals with sufficiency, serves to redundantly suggest that the evidence was insufficient to demonstrate her intent to kill.

[3] Appellant satisfied the first two jurisdictional prongs via her timely post-sentence motion and timely notice of appeal but failed to file a proper Rule 2119(f) statement; her brief contains no express reference to that Rule. *(Footnote Continued Next Page)*

bald assertions of the infirmities in the court's imposition of her sentence, and we are unable to find any indication that the court "ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias[,] or ill[-]will, or arrived at a manifestly unreasonable decision." ***Commonwealth v. Bankes***, 286 A.3d 1302, 1307 (Pa. Super. 2010).

At the sentencing hearing, the court noted that it had reviewed Appellant's pre-sentence report. ***See*** N.T. Sentencing Hearing, 9/20/23, at 4 (unpaginated). "[W]here the trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." ***Commonwealth v. Ventura***, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citation omitted).

_____

Nevertheless, she "set forth a statement of [her] sentencing challenges immediately preceding the [relevant] argument section of [her] brief." ***Commonwealth v. Anderson***, 830 A.2d 1013, 1017 (Pa. Super. 2003). While there is no "properly designated . . . Rule 2119(f) statement, it is sufficient for us to examine whether [she] has identified a colorable claim regarding the appropriateness of [her] sentence under the Sentencing Code." ***Id.*** at 1017-18.

Appellant argues that the "imposition of a consecutive sentence, rather than concurrent [sentences], raises a substantial question in extreme circumstances, where the aggregate sentence is unduly harsh considering the nature of the crimes and the length of imprisonment." Appellant's Brief, at 21. Moreover, she advances a second substantial question regarding when a court imposes an "aggravat[ed] range [sentence] without adequately considering mitigating factors." ***Id.*** at 21-22. Pursuant to ***Commonwealth v. Moury***, 992 A.2d 162, 171-72 (Pa. Super. 2010), both of these questions pass muster. Therefore, we proceed to substantively review Appellant's sentencing claim.

While Appellant contends that her sentence was manifestly unreasonable and that the court did not consider mitigating factors, we find that such arguments are belied by the record, especially when juxtaposed against the heinousness of her actions, the existence of the pre-sentence report as acknowledged by the sentencing court, and the failure of Appellant to identify any specific mitigating factors that could possibly compel a different outcome. As such, she is due no relief at her sentencing claim.

In finding no merit to any of the arguments that she has raised on appeal, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed. The Consented Motion and Amended Consented Motions to Supplement the Reproduced Record are dismissed as MOOT. The trial court opinion is attached for any further appellate review.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/23/2025

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,

PENNSYLVANIA

CRIMINAL DIVISION

**ORIGINAL**
Criminal Division
Dept. Of Court Records
Allegheny County, PA

COMMONWEALTH OF
PENNSYLVANIA

v.

LAURA RAMRIEZ

Appellant,

CP-02-CR-0006707-2020
97 WDA 2024

**OPINION**
**JUDGE BRUCE R. BEEMER**

ORIGINAL

Copies served by first class mail to:

Frank Walker Law
Frank Walker, Esq.
3000 North Lewis Run Road
Clairton, PA 15025

Allegheny County District
Attorney's Office
Ronald Wabby, Esq.
401 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA 15219

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

v.

LAURA RAMRIEZ

Appellant,

CP-02-CR-0006707-2020

97 WDA 2024

## OPINION

Appellant, Laura Ramriez, appeals from the judgment of sentence order imposed after a non-jury trial wherein she was found guilty of Murder of the First Degree, 18 Pa.C.S. § 2502(a); Aggravated Assault, 18 Pa.C.S. § 2702(a)(9); Aggravated Assault, 18 Pa.C.S. § 2702(a)(1); Endangering the Welfare of Children, 18 Pa.C.S. § 4304(a)(1); Unlawful Restraint, 18 Pa.C.S. § 2902(a)(1); and Criminal Conspiracy (Homicide), 18 Pa.C.S. § 903.[1]

A four-day trial commenced on June 26, 2023, with the Court announcing its guilty verdict on July 3, 2023 to the charges referenced above. On September 20, 2023, the Court imposed a mandatory life sentence at Count 1 - Murder of the First Degree. Appellant was sentenced to consecutive periods of incarceration at the

---

[1] Appellant was found not guilty at Count 4 – Involuntary Deviate Sexual Intercourse; 18 Pa.C.S. §3123(b).

2

remaining counts as follows: a period of five (5) to ten (10) years of incarceration at each of the following counts: Count 2 - Aggravated Assault of a Child less than 13 years of age, Count 3 - Aggravated Assault, and Count 4 – Endangering the Welfare of Children; at Count 6 – Unlawful Restraint, two (2) to four (4) years of incarceration; and at Count 7 – Criminal Conspiracy, a period of twenty (20) to forty (40) years of incarceration. This resulted in an aggregate sentence of life imprisonment followed by thirty-seven (37) to seventy-four (74) years of incarceration.

A timely Post Sentence Motion filed on September 25, 2023 was denied by this Court on December 20, 2023. A timely notice of appeal was filed on January 17, 2024, and a Concise Statement of Matters Complained of on Appeal (hereinafter Statement) was filed on April 25, 2024. This Opinion follows.

## FACTUAL BACKGROUND

Evidence presented at trial revealed that B.S. was the biological child of Jose Salazar-Ortiz and Nichole Seachrist (hereinafter Mother), with whom Salazar-Ortiz had an affair. At the age of nine months, B.S. was removed from her mother's care due to neglect and malnutrition. As Mother was her only care giver, B.S. was subject to an emergency placement with a foster family on May 31, 2017. (Non-Jury Trial Transcript (N.T.) June 26, 2023 – June 30, 2023, pp. 254-255). During her six-week

3

stay with the foster family B.S. gained weight, showed increased strength, and overall was in good health. (Id. at 255-258). On July 14, 2017, B.S. began living with Salazar-Ortiz and his family. The family included Appellant and her three biological sons, J.S., J.A.S. and A.R., who were 11, 10, and 4 years old respectively. (Id. at 236, 278-280; Commonwealth Exhibit 32 and Exhibit 55 – Transcript of Jose Eduardo Salazar-Ortiz Police Interview at St. Margaret's Hospital, (Salazar-Ortiz I.T.) p. 13; Exhibit 27 and Exhibit 28, Transcript of Laura Ramriez Police Interview at St. Margaret's Hospital, (Ramriez I.T.) p. 1-8, 12-13). For the next year, B.S. resided in Appellant's Oakmont home, a Pittsburgh suburb. This lasted until August of 2018, when Salazar-Ortiz took B.S. to North Carolina to live with family members, including his sister, Elisabed Salazar-Ortiz. (N.T. at 267). Ms. Salazar-Ortiz testified that when B.S. first arrived in North Carolina she appeared developmentally delayed and recalled that her feet were bruised and swollen. (Id. at 268-269, 275). However, over the next year B.S. thrived in her family's care and was very playful and loving. (Id. at 270; Commonwealth Exhibits 147-156). In August of 2019, B.S., now 3 years old, returned to Pittsburgh to live with Appellant and Salazar-Ortiz. (Ramriez I.T. at 10; Id. at 106-107).

For the next ten months, until her death on June 9, 2020, B.S. suffered unspeakable physical, emotional, and sexual abuse. This all occurred while B.S. was in Appellant's home, as evidenced by the Commonwealth's nineteen (19)

4

witnesses and 330 exhibits. The physical abuse was so severe and prolonged it met the medical definition of torture. Dr. Jennifer Wolford, an expert in Pediatrics and Child Abuse Pediatrics, described that abuse and neglect of this degree includes repeated psychological and physical injuries that can include starvation and withholding basic needs. (Id. at 457).

Dr. Wolford testified that B.S., who was just shy of her 4th birthday at the time of her death, weighed only twenty pounds, which is consistent with the weight of a one-year old. (Id. at 451-452). To provide imagery, Dr. Wolford described B.S.'s physical appearance as reminiscent of a child from a concentration camp. (Id. at 454). Dr. Wolford also noted significant physical abuse to B.S.'s body in the form of bruises that were too numerous to count. (Id. at 456). It was apparent that B.S. had been "starved to death", not only by her weight, but through the physical condition of her body. (Id. at 452). Her body lacked any subcutaneous fat, resulting in sunken cheekbones, pronounced ribs, hips, knees, shoulders, and backbones. (Id. at 452, 454). Further signs of severe malnourishment were her lack of head hair and conversely hair growth on her face and back. This hair growth, called lanugo, occurs at the end of starvation when the body attempts to keep itself warm when there is no longer any body fat. (Id. at 453-454). She testified that B.S.'s life was painful, not only because of the physical abuse B.S. clearly suffered but because when a person starves to death the body does everything it can to maintain end organ function.

Thus, out of necessity the body essentially eats away at itself, first consuming fat, and then muscle, which negatively affects physical development and ability, brain function, and organ function. (Id. at 458-459). Dr. Wolford emphasized that these physical attributes do not happen in days or even weeks, and this led to the medical conclusion that B.S. was the "victim of profound and extraordinary physical abuse and neglect and torture." (Id. at 456-457).

Dr. Wolford's physical description of B.S was shared by multiple Commonwealth witnesses who served as first responders and medical staff on June 9, 2020. (Id. at 48-49, 57, 64, 70, 76, 83). This depiction was also consistent with the autopsy findings of forensic pathologist Dr. Baiyang Xu, who found that B.S. suffered from cachexia, a medical condition that occurs when muscle tissue atrophies resulting in just skin laying over bone. (Id. at 165-166, 173).

Dr. Xu performed an autopsy on June 20, 2020, and he noted bruising and abrasions on every part of B.S.'s body. These injuries were at various stages of healing, which signified trauma that had been inflicted over a period of time. (Id. at 164). From head to toe, Dr. Xu described his findings using accompanying photographs taken during the autopsy. (See Commonwealth Exhibits 41-54). Bruising and abrasions were evident to her entire head, including both the exterior and interior scalp, and the exterior and interior of her lower lip. She had bruising as well on her arms, trunk, back, legs, pelvis, shoulders, and buttock. (Id. at 174-188).

6

The skeletal frame of B.S. showed protruding bones; specifically her hips, shoulders, buttock, and pelvis. (Id. at 173, 178-180). The post-mortem examination also revealed internal and external physical trauma to her genitalia and rectum. (Id. at 166-167, 185-186). The nature of this trauma was testified to in detail by Natalie Hoover, a SANE (Sexual Assault Nurse Examiner) nurse, who documented extensive bruising to both the vagina and rectum. (Id. at 158-161) (Commonwealth Exhibits 33-40).

The neuropathology report prepared by UPMC was subsumed within the autopsy report. (Id. at 169). This report detected both a recent and old injury to B.S.'s brain and microencephaly, which is brain underdevelopment caused by malnutrition. (Id. at 188-191). Together, the findings of the autopsy led Dr. Xu to conclude that B.S. was the victim of homicide as a result of severe malnutrition. The diagnosis of malnutrition was supported not only by her low body weight and pronounced cachexia, but by the accompanying conditions including: low blood sugar; dehydration; lanugo; and protruding bones. (Id. at 167-193).

The abuse was able to be sustained for months because B.S. was isolated from the outside world. B.S. was not enrolled in preschool, under doctor's care, or allowed outside. (Ramriez I.T. at 50-52; Id. at 281). The level of isolation, and the lengths Appellant and her co-conspirators took to ensure that isolation, was best illustrated through the testimony of Appellant's neighbor, Jane Foster. Ms. Foster

is a long-time resident of Oakmont and lived across the street from Appellant and her family. During the three (3) to four (4) years that Appellant lived at the 10th Street residence, Foster knew that Appellant and Salazar-Ortiz had three (3) boys. However, in the spring of 2018, Foster recalled seeing a baby on Appellant's hip. Appellant explained the baby was temporarily in their care to help a friend. (Id. at 37). In the fall of 2018 Foster asked Appellant about this child since she had not seen her the entire summer. Appellant responded that she and Salazar-Ortiz had given the child back. (Id. at 38). On June 9, 2020, Foster noticed emergency vehicles outside Appellant's home and observed a stretcher exit the house with a child. She stated the child had no signs of life and appeared small, emaciated, and had very little hair. (N.T. at 40). Foster did not recognize the child, nor had she seen this child at or outside Appellant's home in the months leading up to that day. (N.T. at 40). It was not until twenty (20) to thirty (30) minutes later that Foster saw Appellant and Salazar-Ortiz leave the house.

The following message between Appellant and Salazar-Ortiz less than two months before her death further illustrated the deliberate efforts to keep B.S.'s existence and abuse from the outside world.

**April 18, 2020**

> Salazar-Ortiz: "I hear knocking."
> Appellant: "From? Is it Chuntis or the cops?"
> Salazar-Ortiz:"I don't know. I don't want to check."

> Appellant: "OMG [oh my God]. Check if it's her. You can see through the glass. Hello?"
>
> Salazar-Ortiz: "Cops left."
>
> Appellant: "It was the cops."

(N.T. at 397)

It was undisputed that Salazar-Ortiz was the sole financial support for the family and worked upwards of six days per week. Consequently, Appellant was the primary care giver for the minor children, including B.S. (Ramriez H.T. at 16-18).

In May of 2020, a month before B.S.'s death, Ashanti Garcia came to Pittsburgh from Charlotte, North Carolina to visit Appellant. She joined her other sisters, Alexis Herrera, a co-actor in this case[2], and minor sister, J.B., who had been staying at Appellant's home. (N.T. at 277-280; Ramriez H.T. at 14-15). Prior to arriving at the home, Garcia had never met B.S., although she had seen pictures of her that showed a chubby-cheeked little girl dressed in nice clothes. (N.T. at 280-281). However, when Garcia arrived she found a very different child. B.S. was "really skinny", only wore pajamas, and never went outside. (N.T. at 281-282).

Garcia described B.S.'s daily life, including how Appellant forced B.S. to sit on a toilet the entire day, every day, as a form of potty training. Typically, Garcia would wake around 9:00 a.m. to find B.S. already sitting on the toilet, where she

---

[2] The case against Alexis Herrera is filed at CP-02-CR-006706-2020. On May 15, 2024, she entered a guilty plea to a general count of homicide. A degree of guilt hearing is scheduled for August 1, 2024.

remained through dinner time. (N.T. at 284-286). She explained that whenever B.S. got off the toilet, or even tried, she was subjected to physical violence by Appellant, including being struck with a wooden spoon, but most often, an open hand or closed fist all over her body. (N.T. at 287-290).

Garcia further testified that no one in the house had any food restrictions regarding what or how much they could eat, except for B.S. (N.T. at 286-287). This was enforced by Appellant, who kept strict control over what B.S. ate. Appellant did not permit anyone else to provide B.S. with any food. Garcia detailed that B.S. was only fed one to two times per day and that it was typically a banana and/or a peanut butter and jelly sandwich delivered to her only by Appellant. (N.T. at 286). Garcia described that on one occasion she gave B.S. a M&M candy while B.S. was made to sit on the toilet. (N.T. at 289). Upon seeing this, Appellant choked Garcia and yelled at her to never do that again. Garcia never did. (N.T. at 290).

The restrictions imposed on B.S. also extended to where she was allowed to eat. In this household, dinner occurred after Salazar-Ortiz came home from work. For this meal, the three boys, Appellant, Salazar-Ortiz, Garcia, Herrera, and J.B., would all eat together at the dining room table. Garcia described eating homecooked meals as well as various types of takeout. (N.T. at 298-299). However, B.S. never joined them for any meals, whether it be breakfast, lunch, or dinner, as she was

forced to eat her food where she spent the day, alone, in the bathroom, and on a toilet.

The isolation Garcia witnessed extended to social interactions as well. Three-year old B.S. did not have any toys, nor was she allowed to play with the other children's toys. Moreover, if any of the children attempted to play with B.S. they were scolded by Appellant. (N.T. at 282). B.S. was forced to sleep on a cot in the second-floor hallway. Everyone else, including Garcia, Herrera, and J.R., slept in a bedroom. (N.T. at 283-284). In fact, when police searched the residence Allegheny County Detective Mark Restori testified that other than some clothing that was stained with blood and feces, there was nothing found within the home that would indicate that B.S. was part of the family. She did not appear to have any toys and she was not in any of the numerous family photos displayed inside the residence. (N.T. at 228-229, 235; Commonwealth Exhibits 97 and 98). The family photographs included only Appellant, Salazar-Ortiz, and the three minor boys.

All of this was witnessed by Garcia, which prompted the then 17 year-old to offer to take B.S. back to North Carolina and raise her. Appellant refused, retorting that B.S. doesn't deserve that life. (N.T. at 291).

Testimony revealed those who resided in this house lived a life completely opposite than the one experienced by B.S. The home was clean, neat, and well-organized, both inside and out. The kitchen was well stocked with a variety of foods

and the bedrooms were appropriately furnished. (Commonwealth Exhibits 56-64, 74-80, 93-113) In fact, Appellant converted a spare bedroom into a vanity/dressing room which she used to display expensive make-up, sunglasses, and handbags. (N.T. at 218-219; Commonwealth Exhibit 74). Thus, outwardly 514 10th Street in Oakmont presented as a loving home, and for Appellant, Salazar-Ortiz, and their three biological children, it was. However, for B.S. it was a house of horrors.

The severity of the physical and psychological abuse inflicted upon B.S. while under the care of Appellant and Salazar-Ortiz was well documented in photographs and approximately 3,000 pages of text messages exchanged between them. (N.T at 312; Exhibit 160). These exchanges narrated some of the physical abuse inflicted upon B.S., and evidenced the absolute contempt and loathing Appellant felt towards the child Salazar-Ortiz had as a result of an affair. Throughout the 3000 messages exchanged between Appellant and Salazar-Ortiz, neither one of them refer to B.S. by her given name. Instead, they call three-year-old B.S. "Chuntis", "ugly", "dumb", "animal", "SSI", "retard", and "bitch". (N.T. at 327-328, 333-335, 347-352, 358, 363-367, 370-371, 374-375, 388-389, 396, 400, 530, 532, 536, 540, 542). The photos exchanged within these messages were powerful proof of the prolonged nature of the abuse. Collectively, they illustrated the absolute deterioration of B.S.'s body while she lived at the house from August of 2019 until her death on June 9, 2020.

Salazar-Ortiz and Appellant both consented to an interview with Allegheny County police detectives at the hospital shortly after B.S. was transported there. During these interviews they explained how B.S. came into their custody and that she lived with them for about a year before living with Salazar-Ortiz's family in North Carolina from August 2018 until August 2019. (Salazar-Ortiz H.T. at 6-7, 9; Ramriez H.T. at 5-8). B.S. then returned to Pittsburgh and resumed living with them at the Oakmont residence. During his interview, Salazar-Ortiz dismissed concerns about B.S.'s weight, noting that her biological mother is also "skinny". (Salazar-Ortiz H.T. at 16-19). Overall, Appellant acknowledged that B.S. suffered hair loss and that she was underweight, but stated neither felt the need to seek medical attention for her. In fact, when confronted about the significant amount of bruising to B.S.'s body, Salazar-Ortiz denied any knowledge of it and then quickly pivoted with an explanation that B.S. falls a lot and bruises easily. (Salazar-Ortiz H.T. at 20, 24, 26). Regarding her swollen feet, Appellant and Salazar-Ortiz both assumed it was a blood circulation problem, yet they never sought a medical opinion. (Salazar-Ortiz H.T. at 22). During a subsequent interview at Allegheny County Police headquarters Salazar-Ortiz told detectives that the morning of June 9, 2020 B.S. was asleep on a cot in the hallway and appeared sluggish, but was otherwise fine. Appellant echoed this sentiment during her interview. (N.T. at 108; Ramriez H.T.

13

at 23-24). In fact, Salazar-Ortiz told Detective Nicole DePaoli that B.S. gave him a "fist bump" as he left for work.

This picture of a tired but otherwise healthy child was refuted by the physical and medical findings outlined above, and by the testimony of Appellant's sister, Ashanti Garcia. In the days leading up to B.S.'s death, Appellant and Salazar-Ortiz were away celebrating their anniversary and Garcia and Herrera were left in charge of B.S. and the three boys. Garcia testified that when Appellant left for the weekend it was evident that B.S. was weak. At this time B.S. was barely eating and lacked the physical strength to hold herself up on the toilet, which caused her to repeatedly fall off and onto the floor. (N.T. at 292-293). This was all reported to Appellant upon her return the night of June 8, 2020. Instead of expressing concern, Appellant became upset. She grabbed B.S. from the second-floor bathroom, carried her downstairs and sat her on the bottom step of the staircase. Garcia witnessed Appellant yell at B.S. for falling off the toilet. She subsequently punched B.S. in the face. (N.T. at 293-294).

Around 9:00 a.m. the next morning, Garcia observed B.S. on the cot in the hallway and she appeared to be sleeping. She explained this was unusual because B.S. was normally made to sit on the toilet by this time of day. (N.T. at 295). Later that morning Garcia left with Appellant to get Pedialyte for B.S. When they arrived back at the residence, only Appellant went upstairs to check on B.S. Appellant

14

returned downstairs and informed Garcia that she moved B.S. into her bedroom closet with a space heater because she seemed cold. (N.T. at 296-297). Around lunchtime, Appellant and Alexis left to pick up Chinese food. (N.T. at 297). After they ate lunch, Appellant went upstairs and then yelled to Herrera that B.S. was not responsive. (N.T. at 298).

Although Garcia helped take care of the children the weekend leading up to June 9, 2020, it is abundantly clear that Herrera played the dominant care-taking role for the minor children anytime Appellant was not home. This was established through thousands of text messages exchanged between Appellant and Herrera after Herrera began living at the Oakmont residence in January of 2020. Using this parameter, Allegheny County Police Detective Daniel Mayer discovered roughly 3,000 messages up through June 9, 2020, the day B.S. died. (N.T. at 427, Commonwealth Exhibit 236).

Over these six months, the contempt that both Appellant and Herrera shared for B.S. was evident. Much like Appellant's conversations with B.S.'s father, Salazar-Ortiz, Herrera and Appellant referred to B.S. using the following names: "ugly", "retard", "hoe", "bitch", "animal", "crackhead", "Ebola", "cross-eyed animal", and Chuntis." (N.T. at 431-542). These vile conversations were often accompanied by the word "Teaa(a)", which Detective Mayer explained appeared to indicate laughter or something in jest. (N.T. at 436). These conversations, discussed

15

in further detail below, chronicled the calculated and cruel physical and emotional abuse inflicted by Herrera at either the direction or approval of Appellant.

## MATTERS COMPLAINED OF ON APPEAL

Appellant raises three (3) claims of error in her Statement. First, Appellant challenges the evidentiary ruling by the Court to admit the police interviews of Salazar-Ortiz. Second, Appellant contests the sufficiency of the evidence for all the charged crimes. Lastly, Appellant avers that the imposition of consecutive sentences was an abuse of discretion.

## ADMISSIBLITY OF INTERVIEW OF SALAZAR-ORTIZ

Appellant claims the Court erred in admitting the police interview of co-conspirator Salazar-Ortiz over Appellant's objection that this evidence violated the Confrontation Clause guaranteed by the Sixth Amendment of the United States Constitution.

The Court finds that this claim is waived. At trial, the Commonwealth called Allegheny County Detective Scott Klobchur regarding his interview of Salazar-Ortiz that occurred at the hospital and sought to admit the audio recording of the same. Appellant made a timely objection to admission of this evidence arguing that it was hearsay and would violate the Confrontation Clause. (N.T. at 127). The Court took

16

brief argument without ruling, with the understanding that the issue would be decided when the trial reconvened the following day. The next day the parties entered an agreement on the record to omit portions of the interview and Appellant withdrew the objection. (N.T. 196-197).

It is well settled that to preserve an evidentiary objection for purposes of appellate review, a party must make a timely and specific objection before the trial court. *Commonwealth v. Thomas*, 194 A.3d 159 (Pa. Super. 2018). As Appellant withdrew the objection and the Court did not make a ruling, any challenge to the admissibility of this evidence was not preserved and is deemed waived.

## SUFFICIENCY OF THE EVIDENCE

The applicable standard for assessing a challenge to the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Johnson*, 236 A.3d 1141, 1151-1152 (Pa. Super. 2020). The Commonwealth is not burdened with precluding every possibility of innocence. *Commonwealth v. Shaw*, 203 A.3d 281, 284 (Pa. Super. 2019). Moreover, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by

17

means of wholly circumstantial evidence. *Id.* When the evidence is circumstantial rather than direct, it is sufficient when a combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995).

Here, Appellant was convicted of six criminal offenses. Paragraph 4 of Appellant's Statement reads that the trial evidence was insufficient to convict [Appellant] of the *crimes charged*. With the exception of first-degree murder and criminal conspiracy, Appellant does not state which element(s) of the remaining offenses were not established. Nor does she indicate what Commonwealth evidence, which was introduced over four (4) days through nineteen (19) witnesses and 330 exhibits, was insufficient to establish the elements of the two (2) counts of aggravated assault, endangering the welfare of children, and unlawful restraint.

"If Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient. This Court can then analyze the element or elements on appeal. Where a 1925(b) statement does not specify the allegedly unproven elements, ... the sufficiency issue is waived on appeal." *Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015) (citation omitted).

Under the theory of vagueness and consistent with precedent, Appellant has waived any sufficiency challenge for the offenses of aggravated assault, aggravated

18

assault of a child less than 13 years of age, endangering the welfare of children, and unlawful restraint.

## MURDER OF THE FIRST DEGREE

In Pennsylvania, murder is categorized in degrees and first-degree murder includes all intentional killings. 18 Pa.C.S. § 2502(a). "To sustain a conviction for first-degree murder the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing and that the killing was done with deliberation. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder." *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) (internal citation omitted). An intentional killing is further defined as a "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. §2502(d). The Commonwealth may establish that the defendant intentionally killed the victim through circumstantial evidence. *Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001).

Appellant's Statement asserts two challenges to the sufficiency of the evidence specific to the crime of first-degree murder. One, that the Commonwealth's evidence failed to prove that the starvation death of B.S. resulted from a specific intent to kill. Two, that the evidence did not establish that Appellant

was present at the scene, such that she can be criminally responsible for the death of B.S.

The Supreme Court of Pennsylvania undertook review of a strikingly similar case involving prolonged torture that led to the death of a child. *Commonwealth v. Tharp*, 830 A.2d 519 (Pa. 2003). Tharp was convicted of capital murder for the starvation death of her seven-year-old daughter, Tausha, one of Tharp's four (4) children. By all accounts, Tausha's siblings were healthy and well fed. However, Tharp deprived Tausha of food and took measures to ensure that no one else provided her with any food. Tausha was isolated within the household, in that she was excluded from family meals and was subject to being restrained either by being tied to furniture, strapped to a toilet or locked in a room. Tausha never received any medical care and outside people were prevented from seeing her. Tharp's contempt for her child was further evidenced when three weeks before her death Tharp stated to a friend that Tausha "belonged six feet under and in a body bag." *Id.* at 525. At the time of her death, the 7 ½ year old weighed just under twelve pounds and her body showed signs of extreme malnutrition, including a complete loss of body fat. In addressing the sufficiency claim, the Pennsylvania Supreme Court decisively stated:

> We recognize that this case is unusual in that death was not brought about by a single act. Rather, the evidence showed a course of conduct over a 7–year period of time. The perhaps-unusual facts, however, do

20

not change the ample evidence of appellant's hardness of heart. They do not change the evidence of a seven-year-old's starvation death at the deliberate hand of her own mother. Indeed, the very length of time needed to bring about Tausha's death by starvation suggests a unique type of coldness and deliberation, for within that time there was ample opportunity for reflection, for reconsideration, and for the development of a tinge of sympathy for the child. That appellant still proceeded in her course reveals the sort of premeditation and deliberation that separates first degree murder from other killings or, at least, the jury could so find.

*Commonwealth v. Tharp*, 830 A.2d at 527.

In the present case, Appellant's argument regarding her presence at the scene is presumably based on testimony that she and Salazar-Ortiz were away the weekend immediately preceding B.S.'s death. However this is irrelevant and the argument meritless in light of the evidence that proved B.S. was starved to death over a period of months and not days.

Appellant was admittedly the primary caregiver to B.S. Salazar-Ortiz worked fourteen (14) hours per day from roughly 5:00 a.m. until 7:00 p.m. and Herrera only watched B.S. while Appellant ran "quick errands" and "never" for hours at a time. (Ramriez H.T. at 18-19, 35 Ln. 8-12). Accordingly, Appellant's argument that she cannot be held criminally responsible based on her limited contact the last weekend of B.S.'s life, is incompatible with the cause of death. An overwhelming amount of evidence demonstrated Appellant's hold and complete control over every aspect of the household, including B.S.'s care.

21

Next, Appellant contends that the Commonwealth's evidence was insufficient to establish the requisite *mens rea*. The Court finds this argument also to be without merit.

Here, evidence presented over the course of four (4) days illustrated the strict control that Appellant had over everything that happened within the walls of the 10th Street residence. This extended from how the house was maintained to what the children ate and how discipline was delivered. It was also clear that Appellant devised a different set of rules for her three biological sons, who were by all accounts healthy and normally developed, her youngest only one (1) year older than B.S. In comparison, B.S. was malnourished, physically weak, and developmentally delayed.

Appellant's cold heart and utter disregard for the welfare of B.S. was on display in absolutely every aspect of the child's daily life. It was palpable in how Appellant spoke to her and of her. As noted in the factual summary, Appellant *never* referred to B.S. by name. Instead, she and her co-conspirators repeatedly called B.S.: ugly; dumb; animal; SSI; retard; and bitch. The complete disregard of B.S. as a vulnerable and defenseless child, or even as a human being, was also apparent by the complete lack of care, deliberate isolation, degradation, deprivation of food, and infliction of physical abuse.

It was obvious to every first responder and medical professional who saw B.S. for the first time on June 9, 2020, that she was severely malnourished and in need of

22

medical care. Yet, Appellant, who was admittedly the primary caregiver, not only ignored her emaciated state, but refused to provide B.S. with even basic medical care that could have prevented her death. The Commonwealth's evidence showed that B.S. did not have a pediatrician and despite her apparent needs, Appellant never sought any medical attention for B.S. at any time after she moved back to Pittsburgh in August of 2019. (Ramriez H.T. at 50-52, 67). This neglect was not because Appellant did not recognize the need for care or that she lacked a basic understanding of the importance. This was deliberate.

Just a month before her death Appellant and Salazar-Ortiz messaged about B.S. having swollen hands and feet and a bloody nose:

> **Appellant:** How is your kid[']s poor circulation supposed to go away if she is supposed to be mobile and she refuses to.
> **Salazar-Ortiz:** I don't know.
> **Appellant:** Well, I think you should take her to doctor.
> **Salazar-Ortiz:** We.
> **Appellant:** Not me. I have kids.
> **Salazar-Ortiz:** I do too.

N.T. at 414.

Only days later on May 11, 2020, Appellant and Salazar-Ortiz discuss an upcoming doctor's appointment for one of their sons:

> **Appellant:** Feed Chuntis.
> **Salazar-Ortiz:** Okay.
> **Salazar-Ortiz:** Doctors kids 10 on Tuesday Jr appointment, 412-219-1313.

N.T. at 415.

To Appellant, B.S. was not human or worthy of being treated with any type of care or dignity, because B.S served as a daily reminder of Salazar-Ortiz's infidelity. Appellant took issue with anything three-year old B.S. did, said, or didn't say or do. Only weeks after B.S. began living with Appellant the following exchange occurred between Appellant and Salazar-Ortiz:

**September 13, 2019**

> **Appellant:** She is being rude today and I will beat her ass and give her a cold shower. I'm not in the mood for it. She's not my responsibility.
> **Salazar-Ortiz:** Okay

(N.T. at 325)

**November 19, 2019**

> **Appellant:** She your kid, not mine

(N.T. at 342)

**December 20, 2019 (349)**

> **Salazar-Ortiz:** I can't take this on to next year. I have to rehome that animal elsewhere. It didn't bring anything but more problems to this household. So you have two options. One, I can drop her off to CYF or tomorrow take her back where she came from. I am telling because I don't want to do this behind your back.
> **Appellant:** You aren't giving her to your moms.

(N.T. at 349)

**January 20, 2020**

> **Appellant:** I hate her with a passion. And I hate you sometimes since she your kid. It disgusts me that ya'll share DNA.

**Salazar-Ortiz**: Yeah, I know. Just a couple more days this will be over. I know. You hate me.

**Appellant**: No, I hate you sometimes over her. You fight with me. You sent her with your people who talk real bad about me. I just hate her!

(N.T. at 364)

**February 5, 2020**

**Appellant**: Wyd [what you doing]?
**Salazar-Ortiz**: I was beating some ass.
**Appellant**: I wonder why. Where's JR?
**Salazar-Ortiz**: You still far out? If not, I can heat up tortillas.
**Appellant**: No, here. It's trash day today.
**Salazar-Ortiz**: Okay. Can we put that child outside as well?
**Appellant**: Please do.

(N.T. at 366)

**February 12, 2020**

**Appellant**: Chuntis don't got two mom. She don't even have one.
**Herrera**: Teaaa. Tru, Tru.

(N.T. at 442)

Despite this loathing, there appeared to be an effort in the first few months to include B.S. into the family. However, starting in mid to late November there was a noticeable shift in B.S.'s physical appearance and her demeanor. (N.T. at 340-341, Commonwealth Exhibit 186). Various photos of B.S. starting in December of 2019 depict how her body has become thinner, and she appeared disheveled and unhappy. (Commonwealth Exhibits 192-195). Months later, in February 2020, B.S.'s hair is thinner, red marks are visible on her forehead and legs, and she is experiencing hair growth on her back. (Commonwealth Exhibits 209, 216). B.S.'s

thinning frame was a direct result of Appellant intentional starvation, which she ensured through the use of the other adults in the home who followed her direction.

Appellant's sister, Ashanti Garcia, provided firsthand observations of how Appellant exercised her control over how B.S. was fed. She testified that B.S. was fed only one to two times a day and only by Appellant. Her "meals" consisted of either a banana or peanut and butter jelly sandwiches, which she was forced to eat while sitting on the toilet, as B.S was never allowed to eat downstairs at the dining room table or kitchen. (N.T. at 286). Much like the other forms of abuse, the food restriction and its affects observed by Garcia were corroborated through the thousands of messages exchanged between Appellant and her co-conspirators.

**February 20, 2020**

> Appellant: "Your kid has gained three pounds back."
> Salazar-Ortiz: "Let's try to make her gain 10. Then I can get her over to CYF."
> Appellant: "That means she would be bigger than when she came from your mom's."

(N.T. at 383)

**April 4, 2020**

> Appellant: Can you feed that ugly thing something nasty?
> Herrera: Ooooooooo.
> Appellant: A tuna or peanut butter.
> Herrera: Kk.
> ...

26

Herrera follows this exchange with an image of a sandwich (Commonwealth Exhibit 288)

> **Appellant:** What kind is the sandwich? ...
> **Herrera:** Peanut butter because I wasn't going to make a tuna.
> **Appellant:** Lol (laughing out loud) yes.
> **Herrera:** She don't deserve no mayonnaise. It tastes too good.
> **Appellant:** True and our tuna is expensive. I'm going to buy the cheap on.
> **Herrera:** She could have gotten like that wic like that 89 cent tuna.
> [Appellant indicates that she "laughed" at this comment.]
> **Appellant:** Give her one of her fruit cups with no juice too.

(N.T. at 507-508)

As was common practice, Herrera sent Appellant photos documenting food she gave the children. In a particular act of cruelty, Herrera sent Appellant images of paper plates with pepperoni pizza, cheese sticks, and popcorn chicken that was for the boys. B.S. is visible within these images. (Commonwealth Exhibits 255 and 256). Appellant responds that "they", referring to the boys, are fat. This is followed by an image of B.S. sitting at the table with a bowl of rice and a plastic spoon. (Commonwealth Exhibit 257) The following exchange then takes place:

> **Appellant:** Tea. Was she butt hurt since she didn't get pizza.
>
> **Herrera:** Yep. She was all happy talking. Saw I was serving her rice and put her cara de wtf.
>
> **Appellant:** Cuz she thought she was gonna eat that. She THOUGHT.
>
> **Herrera:** Forreal. I said sis bye.

27

**Appellant:** She don't deserve that. (Accompanied by a meme of a woman with tears and laughing.)

(N.T. at 471-473)

On May 17, 2020, while discussing picking up food, which included chinese, Taco Bell, Wendy's, and Starbucks for herself, Herrera, and Appellant's sons, Appellant directs Herrera to make B.S. oatmeal. (N.T. at 526).

The effects of the food deprivation were so extreme that three (3) year old B.S. tried to feed and hydrate herself by extreme means including drinking toilet water and sneaking into the kitchen for food.

**February 11, 2020**

> **Appellant:** I'm going to kill your kid. She came downstairs when I left her on the toilet and grabbed the stool and was playing with the fruit. Alexis found her and put her in the downstairs toilet and was downstairs here for a while. Then went upstairs to get ready for work and she came down 25 minutes later to find her with the scissors in her hand and the sour cream, butter, and pickles out of the refrigerator.

(N.T. at 367-368)

**February 17, 2020**

> **Appellant:** Yo you think she was drinking the toilet water cuz she was dehydrated. Look how low the water got. (Accompanied by a picture of the toilet bowl. Commonwealth Exhibit 247).
> **Herrera:** I doubt it.
> **Appellant:** She went to it three times. Like who the hell does that.

(N.T. at 464)

28

**February 24, 2020**

      **Appellant:** Don't feed her ass tomorrow.
      **Herrera:** Okay I won't.

(N.T. at 476)

B.S. was even physically restrained for hours at a time to prevent her from trying to drink and/or feed herself, because the extreme measures undertaken by B.S. were not viewed acts of desperation, but as defiance that demanded B.S. be beaten and physically restrained.

**February 12, 2020**

      **Herrera:** She got out again.
      **Appellant:** Where she at.
      **Herrera:** She came upstairs.
      **Appellant:** Where tho.
      **Herrera:** Restroom.
      **Appellant:** To do what.
      **Herrera:** We back downstairs. Playing with Alan's toys. I made her nose bleed.
      **Appellant:** Good. I'm gonna beat her.

Herrera then sends Appellant a four (4) minute long video (Commonwealth Exhibit 234) that depicts B.S. positioned against the stairwell with one leg up and horizontally on a step. B.S. stands in this position with her hands up on top of her head. Herrera is seen walking by B.S. into another room. Towards the end of the video, B.S. removes her leg and limps away into another room.

29

The next day, on February 13, 2020, Appellant sends an image to Herrera. (Commonwealth Exhibit 243). B.S. is again restrained in what Appellant and Herrera refer to as the "cage" or "chamber", which was a day bed without a mattress turned to face the wall to block the opening. (N.T. at 483, 486). In this image, B.S. is facing the wall with her head down while bound at her wrists with her hands up against the wall. Her feet are also bound at the ankles while she stands on the metal grating system of the day bed. (N.T. at 443-444). The two then message the following:

> **Herrera:** Teaaaa.
> **Appellant:** Kill me. This bitch got off the toilet and went all the way downstairs while I was gone.
> **Herrera:** No.
> **Appellant:** Yes. JR snitches when I got here.
> **Herrera:** Oooop. You hit her?
> **Appellant:** No. Cold shower.

**February 14, 2020**

> **Appellant:** When you get there untie that hoe and sit her on the toilet but for only 20 min. We should be home before 6. I'll text you when I'm heading that way so you can sit her on the toilet.
> **Herrera:** Okayyy. I already did.
> **Appellant:** Teaaa. Was she in the same position.
> **Herrera:** Yea, she was.
> **Appellant:** Okay, we almost home.

**February 22-24, 2020**

> **Herrera:** ... But tell me why she tried to get off the toilet and I caught her, me and Junior.

**Appellant:** No!!!

**Herrera** Yasss.

**Appellant:** Where was she going supposedly? Did you spank her ass? I'm telling you flip the crib towards the wall and make her ass stand up there. Eventually she will lay down. I know her lazy will. Told you you can't be nice to her.

(N.T. at 475-476)

The callousness of the exchanges between Appellant and Herrera regarding the abuse of B.S. is chilling and further proof of Appellant's malice and intent. On February 21, 2020, Herrera sends an image to Appellant of B.S. in a closet. B.S.'s arms are behind her back, her face is down, and one leg is bent at the knee with ligatures tied around her legs just above the knee.

> **Appellant:** You do that?
> **Herrera:** Yes, ma'am.
> **Appellant:** Lol. Did you make it so she can't lay.
> **Herrera:** Yes, ma'am.
> **Appellant:** LOL.
> **Herrera:** She mad.
> **Appellant:** Why she can't sit. Or cuz she in there.
> **Herrera:** Both I thing. And her legs tied together where she can't sit. If she does it will hurt.
> **Appellant:** How? You savage.
> **Herrera:** Right above the knees and her ankles are spread out.
> **Appellant:** Tea. Why she crying with fire closed.
> **Herrera:** Yea.
> **Appellant:** Loud?
> **Herrera:** Door?
> **Appellant:** What you want for lunch?

(N.T. at 466-467, Commonwealth Exhibit 250)

31

Adding to the absolute cruelty of Appellant's conduct was her use of her minor boys, who unwittingly participated in the physical and emotional abuse of B.S. (N.T. 437, 475-476, 518-519).

If there were any doubt that Appellant's actions were merely evidence of only contempt for B.S., that was further dispelled by her own words.

**January 16, 2020**

Appellant: She peed on my rug. I'm not dealing with her. I will kill her.

**February 12, 2020**

Appellant: I'm going to kill her.

Salazar-Ortiz: Do you still want to put up with her shit?

Appellant: I never have. She went upstairs and was playing with Allen's toys. I came to Target to get the seat. I am beating her ass when I get home. I don't care.

Salazar-Ortiz: So now you want sending her back, either with my parent or the government?

Appellant: You fucking stupid to ask with those options. You be having a chance to send her back, and you don't. Then she does whatever the TF [the fuck] she wants. And let's praise her for sending to people who let do whatever she wants. Don't worry. I'm going to fuck her up. And you want her to be at your parents dumb ass.

Salazar-Ortiz: My bad. Just saying how much more negative energy our house will have.

Appellant: IDGAF [I don't give a fuck]. You want me to let that bitch talk more shit about me. Over my dead body. I'd rather kill the bitch and go to jail. I put that on my son's life.

Salazar-Ortiz: You can't do that. Don't say that. Our sons are way more important than anyone.

Appellant: No, I will. I promise you. Today is her day.

**Salazar-Ortiz:** Ok. Don't do anything around my son. He doesn't have to see the other side of you that she brings out.
**Appellant:** To bad.

(N.T. at 368-369)

**April 12, 2020**

**Appellant:** Right? Well guess what, it's not going to work. Idgaf [I don't' give a fuck] about her. Idgaf about that little stupid ass bish.
**Appellant:** She's made it over 8 months.
**Herrera:** For real. If anything she gonna be the death of you, not her.
**Appellant:** Exactly.

(N.T. at 513)

A plethora of evidence established a pattern of prolonged abuse. Over a period of ten (10) months Appellant acted willfully, deliberately, and with a hardness of heart that could only lead to one result, the death of B.S.

The evidence demonstrated that Appellant knew of other living options, including foster care or members of either her family or Salazar-Ortiz's family. Yet each time an alternative care arrangement was raised, Appellant *chose* to keep B.S. within her home, expressing that B.S. did not deserve a better life. Moreover, Appellant had the intellect, ability, and finances to care to for B.S. as she was raising three healthy biological sons. Quite simply, she chose not to.

Additionally, Appellant ensured that any chance of help for B.S. was blocked, as she was deliberately isolated from any outside person, neighbor, school, doctor,

33

and even law enforcement. Thus, every word, every direction, every action and inaction, illustrated Appellant's conscious effort to bring about the death of B.S.

It is of no moment that B.S. did not die as a result of a single act. See *Commonwealth v. Chambers,* 980 A.2d 35 (Pa. 2008) (Appellant's intent to kill was proven by a course of conduct that culminated on the night of her murder). B.S.'s body told the story of unimaginable suffering, as the autopsy findings and photos showed that every inch of B.S.'s emaciated body was covered in bruises in various stages of healing that were too numerous to count. Dr. Xu testified that B.S.'s legs, arms, back, genitals, mouth, along with both the exterior and interior of her scalp showed evidence of physical abuse.

Our Pennsylvania Supreme Court stated it best in its sufficiency review for first-degree murder conviction in *Tharp*:

> [T]he very length of time needed to bring about Tausha's death by starvation suggests a unique type of coldness and deliberation, for within that time there was ample opportunity for reflection, for reconsideration, and for the development of a tinge of sympathy for the child. That appellant still proceeded in her course reveals the sort of premeditation and deliberation that separates first degree murder from other killings...

*Tharp,* 830 A.2d at 527.

Thus, viewing the evidence in the light most favorable to the Commonwealth, the Court finds that the record amply supports that B.S. was unlawfully killed and

that Appellant caused the death through prolonged torture that included physical abuse and starvation with the specific intent to bring about her death.

## CRIMINAL CONSPIRACY TO COMMIT FIRST DEGREE MURDER

Appellant's final claim on appeal is that her conviction for conspiracy should be vacated because there was insufficient evidence to show an agreement between Appellant and Salazar-Ortiz and/or Herrera to commit the crime of first-degree murder.

Conspiracy is defined in 18 Pa.C.S. § 903 as follows:

(a) Definition of conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
   (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
   (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime....
(e) Overt Act. No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903(a), (e).

It is rare that co-conspirators ever document or record the nature of their agreement and the crime they intend to commit. With this understanding, the courts have recognized that "[a]n agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and

participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Schoff,* 911 A.2d 147, 160 (Pa. Super. 2006)

The Court in *Commonwealth v. Lambert,* 795 A.2d 1010 (Pa. Super. 2002), thoroughly discussed the necessary components to establish conspiracy.

> A conviction for criminal conspiracy, 18 Pa.C.S.A. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. *Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1030 (1996), *cert. denied,* 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997), *citing* 18 Pa.C.S.A. § 903.

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. *Commonwealth v. Keefer,* 338 Pa. Super. 184, 487 A.2d 915, 918 (1985). Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. *Id.* Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.,* that the Appellant was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." *Hennigan,* 753 at 253. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act. *Commonwealth v. Johnson,* 719 A.2d 778, 784 (Pa. Super. 1998) (*en banc*), *appeal denied,* 559 Pa. 689, 739 A.2d 1056 (1999).

> A conspiracy is almost always proved through circumstantial evidence. *Commonwealth v. Swerdlow,* 431 Pa. Super. 453, 636 A.2d 1173, 1176 (1994). "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Johnson,* 719 A.2d at 785. The evidence must, however, "rise

36

above mere suspicion or possibility of guilty collusion." *Swerdlow*, 636 A.2d at 1177 (citation omitted).

This Court has identified factors to be considered:

Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred. *Commonwealth v. Carter*, 272 Pa. Super. 411, 416 A.2d 523 (1979).

*Commonwealth v. Olds*, 322 Pa. Super. 442, 469 A.2d 1072, 1075 (1983). *See also, Commonwealth v. Azim*, 313 Pa. Super. 310, 459 A.2d 1244 (1983).

Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. *Commonwealth v. Stocker*, 424 Pa. Super. 189, 622 A.2d 333, 342 (1993). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. *Commonwealth v. Soto*, 693 A.2d 226, 229–230 (Pa. Super. 1997), *appeal denied*, 550 Pa. 704, 705 A.2d 1308 (1997). *See also,* 18 Pa.C.S.A. § 306.

The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their

individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

*Commonwealth v. Galindes,* 786 A.2d 1004, 1011 (Pa. Super. 2001).

The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the sine qua non of a conspiracy."

*Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456, 463–464 (1998), *cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999) (citations omitted).

*Lambert,* 795 A.2d at 1016-1017.

Here, the evidence provided the Court a virtual roadmap of their Appellants intentions, actions, and agreements with Salazar-Ortiz and Herrera. This included a thousand text messages exchanged between the three of them. Through these messages the actors detailed their contempt for B.S. and the abuse they inflicted upon her. The accompanying photos exchanged with these messages over a ten-month period illustrated the slow, methodical, and tortuous decline of her body. Each day Appellant, Salazar-Ortiz and Herrera engaged in the abuse, each day they denied B.S. food, and forced her to sit on a toilet for days at a time. Their denial of love, attention, and medical care further evidenced the pact between them.

The days turned to weeks and then stretched to months as her three-year old body withered to twenty pounds. The abuse was so pervasive that B.S. became

conditioned to abusive stances, as reflected by images of the same and video evidence showing B.S. reflexively putting her hands behind her back and/or head without direction. (N.T. 346, 407, 466, 493, 506, 517-519, 551, 555; Commonwealth Exhibits 193, 227, 234, 250, 271, 286, 326). Abuse of this nature, length, and severity, could never have occurred within a single household without the co-conspirators. The evidence was overwhelming in its demonstration that Salazar-Ortiz and Herrera shared Appellant's abhorrence towards B.S., ignored her dire health, and in effect, pledged an oath of silence as to what was occurring behind closed doors. This ensured that B.S. could never be saved from certain death.

Thus, viewing the evidence in the light most favorable to the Commonwealth, the evidence was sufficient beyond a reasonable doubt to establish an agreement between Appellant and Salazar-Ortiz and Herrera to engage in the abuse, neglect, and starvation of B.S. that resulted in her death.

## SUFFICIENCY OF THE EVIDENCE FOR THE REMAINING CHARGES

As stated above, the Court finds that Appellant has waived her sufficiency claims as to the remaining counts, which included two (2) counts of aggravated assault, endangering the welfare of children, and unlawful restraint. However, if no waiver is found, the Court addresses the sufficiency of these charges.

# AGGRAVATED ASSAULT

Appellant was convicted of two separate counts of Aggravated Assault: 18 Pa.C.S. §2702(a)(1) and (a)(9). Both subsections require that a person attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to another. Subsection (a)(1) requires that the act be under circumstances manifesting extreme indifference to the value of human life[3], while subsection (a)(9) has an age specific requirement specifies that the act be perpetrated against a child less than 13 years of age, by a person 18 years of age or older.[4]

The Court thoroughly addressed within its discussion of first-degree murder, the sufficiency of the evidence with respect to establishing malice. There is no distinction between the malice required for both first and third-degree murder and that necessary for aggravated assault...the only difference is the result of the crimes. *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017).

The prolonged physical abuse and innumerable injuries inflicted upon B.S. at the hand of Appellant demonstrated a type of malice rarely seen. This evidence came through the testimony of Ashanti Garcia, who witnessed Appellant hit B.S. daily in the three (3) weeks preceding her death with both an open hand, closed fist, as well as a wooden spoon. (N.T. at 287-288, 303-304). Additionally, the Appellant

---

[3] 18 Pa.C.S. § 2702(a)(1).
[4] 18 Pa.C.S. § 2702(a)(9).

detailed the physical abuse she committed through the thousands of messages exchanged between Appellant and her co-conspirators, Salazar-Ortiz and Herrera.

On September 11, 2019, Appellant sent an image to Salazar-Ortiz via text message of B.S. crying with her pants off explaining that she "hit her so hard with the belt and my hand." (N.T. at 322-323; Commonwealth 164).

**January 7, 2020**

**Appellant:** Oh wow I just beat Chuntis ass with the belt like 16 times. (N.T. at 352)

**January 19, 2020**

Alexis: Wyd, which I understand to be what are you doing. Who was you talking to. Laura: Tell me why Chuntis was laying with Alan's blanket, the one I washed when we came up here? Alexis: What??!!! Laura: That crack child. I took the blanket away when she got the gray rug to cover herself. Alexis: Lmaooo. Laura: I hit her when I saw that. Alexis: I bet you did. What Jose say. Laura: Just a pop. I wanted to spank her but she loud. (N.T.   )

**February 6, 2020**

**Appellant:** ...Me and the boys hit Chuntis in head. Her head was bleeding. (N.T. 436)

Regarding the age requirements of 18 Pa.C.S. §2709(a)(9) the record established that B.S. was three (3) years old when she died and Appellant was twenty-seven (27), thereby satisfying the age specific element. (Ramriez H.T. at 4, 11).

Thus, for the reasoning provided above, the record supports that Appellant repeatedly and severely physically abused B.S. and the evidence was more than sufficient to satisfy the burden of proving the crimes of Aggravated Assault.

## ENDANGERING WELFARE OF CHILDREN

As charged, the crime of endangering the welfare of children is established when, "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support. 18 Pa.C.S. § 4304(a)(1).

The record clearly demonstrated that Appellant served as the primary caregiver to B.S. As the Court finds the evidence was sufficient to support the convictions of first-degree murder and aggravated assault, the Commonwealth satisfied their burden in proving that Appellant, as B.S.'s guardian, violated her duty of care.

## UNLAWFUL RESTRAINT

A person commits the crime of unlawful restraint when he/she knowingly restrains another unlawfully in circumstances exposing him to risk of serious bodily injury. 18 Pa.C.S. §2902(a)(1). Within the Court's thorough discussion of first-degree murder, it highlighted abuse which included multiple incidents wherein B.S. was tied up as a means of physical punishment. The Commonwealth offered video and photographic evidence depicting B.S. bound at her wrists, ankles, knees, and also bound to a stairwell. (N.T. at 438, 466-467, 475-476; Commonwealth Exhibits 240, 243, 250). The accompanying text conversations show that Appellant either administered the bindings, directed the binding, or approved the binding, as a means of facilitating the physical abuse and torture of B.S.

Thus, for the reasoning provided above, the record supports the Commonwealth satisfied their burden as to the crime of unlawful restraint.

## MANIFESTLY EXCESSIVE SENTENCE

In her final claim, Appellant contends that the Court abused its discretion by imposing consecutive sentences.

A reviewing appellate court shall vacate sentence and remand under three circumstances: (1) the sentencing court purported to sentence within the sentencing

guidelines but applied the guidelines erroneously; (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. In all other cases the appellate court shall affirm the sentence imposed by the sentencing court. 42 Pa.C.S. §9781(c).

It has long been held that sentencing is a matter vested in the sound discretion of the sentencing court. The standard of review involving discretionary aspects of a sentence is a manifest abuse of discretion. *Commonwealth v. Foust*, 180 A.3d 416 (Pa. 2018). This is more than just an error in judgment but requires that Appellant establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. *Commonwealth v. Solomon,* 151 A3d. 672 (Pa. Super. 2016), citing *Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa. Super. 2014).

Based on the limited assertion in the Statement, Appellant's claim appears to implicate that her sentence was manifestly excessive. "In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display

of remorse, defiance, or indifference." *Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003), citing *Commonwealth v. Ellis*, 700 A.2d 948, 958 (Pa. Super 1997). This discretion extends to the choice to run sentences concurrently or consecutively. *Mouzon* at 1130.

The tragedy of this case cannot be overstated. The nature of the prolonged abuse that caused the death of B.S. was committed by Appellant through her unique role as caregiver. She utilized this role by not allowing B.S. to grow and thrive, but rather to torture a defenseless three (3) year old child. She did this by exercising complete control over B.S.'s basic needs and through her coordinated acts with Herrera and Salazar-Ortiz. Moreover, it was the Court's observation that Appellant appeared completely indifferent and unaffected during the four (4) day trial, as well as at the sentencing hearing.

The Court had the benefit of the Presentence Report and the sentencing guidelines. After consideration of all the statutory factors and information received, the Court determined that a sentence at only Count 1 – First-Degree Murder would have inadequately reflected the pervasive cruelty inflicted upon B.S. by Appellant. Individualized sentences do not require courts to impose the minimum possible confinement. *Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa. Super. 2010). To impose a sentence that did not reflect the true intention of Appellant's conduct would not address the nature and gravity of the offenses. The sentence of life imprisonment

plus thirty-seven (37) to seventy-four (74) years of incarceration was not an abuse of discretion.

For all the reasons stated in this Opinion, the judgment of sentence should be AFFIRMED.

_____ J.
BRUCE R. BEEMER